**TIMOTHY J. KELLY, UNITED STATES DISTRICT JUDGE**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Docket No.: 0090 1:21CR00175-002** |
| | : | |
| **vs.** | : | **Disclosure Date: July 27, 2023** |
| | : | |
| **Biggs, Joseph** | : | |

## PARTIES OBLIGATION AND RESPONSE TO PRESENTENCE REPORT

Pursuant to Fed. Rules of Crim. Proc. Rule 32(f)(1) and (2), the parties shall submit any material inaccuracies or disputes to the presentence investigation report (PSR), by August 10, 2023. This form and/or objections to the PSR shall be filed via CM/ECF.

Note: The probation office never includes information about 18 USC § 3553(e) or USSG § 5K1.1, pursuant to Rule 32(d)(3).

### For the Government

(CHECK APPROPRIATE BOX)

      (   )    There are no material/factual inaccuracies therein.

      (   )    There are material/factual inaccuracies in the PSR.

### For the Defendant

(CHECK APPROPRIATE BOX)

      (   )    There are no material/factual inaccuracies therein.

      (   )    There are material/factual inaccuracies in the PSR.

### Restrictions on Use and Redisclosure of Presentence Report

The presentence investigation report and this form are not public documents.

It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| vs. | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| | ) | **Docket No.:    0090 1:21CR00175-002** |
| **Joseph Biggs** | ) | |
| | ) | |

**Prepared for:**     Timothy J. Kelly
                      United States District Judge

**Prepared by:**      Sherry  Baker
                      Senior United States Probation Officer
                      (202) 565-1327
                      sherry_baker@dcp.uscourts.gov

| **Assistant U.S. Attorney** | **Defense Counsel** |
|---|---|
| Jason Bradley Adam McCullough | John Daniel Hull IV |
| Erik Michael Kenerson | 1420 N Street, NW |
| 601 D Street NW | Washington, DC 20005 |
| Washington, DC 20530 | 202-429-6520 |
| (202) 252-7233; | jdhull@hullmcguire.com |
| (202) 252-7201 | |
| jason.mccullough2@usdoj.gov | |
| erik.kenerson@usdoj.gov | Norman A Pattis |
| | 383 Orange Street |
| | 1st Floor |
| Conor Mulroe | New Haven, CT 06511 |
| 1301 New York Avenue, NW | 203-393-3017 |
| Suite 700 | npattis@pattisandsmith.com |
| Washington, DC 20005 | |
| (202) 330-1788 | |
| conor.mulroe@usdoj.gov | Sebastian Marks Norton |
| | 108 N. Alfred Street |
| | 2nd - Floor |
| Nadia Moore | Alexandria, VA 22314 |
| 271 Cadman Plaza East | 703-683-7070 |
| Brooklyn, NY 11201 | sebastian@kingcampbell.com |
| (718) 254-6362 | |
| nadia.moore@usdoj.gov | |

**Sentence Date:**     August 31, 2023, at 10:00 AM

**Date Prepared:**     July 27, 2023          **Date Revised:**

**BIGGS**, Joseph                                                                                       Page 2

| | | |
|---|---|---|
| **Offense:** | Count 1: | Seditious Conspiracy<br>18 USC § 2384<br>20 years imprisonment/$250,000 fine |
| | Count 2: | Conspiracy to Obstruct an Official Proceeding<br>18 USC § 1512(k)<br>20 years imprisonment/$250,000 fine |
| | Count 3: | Obstruction of an Official Proceeding and Aiding and Abetting<br>18 USC §§ 1512(c)(2) and 2<br>20 years imprisonment/$250,000 fine |
| | Count 4: | Conspiracy to Prevent an Officer from Discharging Any Duties<br>18 USC § 372<br>6 years imprisonment/$250,000 fine |
| | Count 5: | Obstructing Officers During a Civil Disorder and Aiding and Abetting<br>18 USC §§ 231(a)(3) and 2<br>5 years imprisonment/$250,000 fine |
| | Count 6: | Destruction of Government Property of Value Over $1,000 (Fence) and Aiding and Abetting<br>18 USC §§ 1361 and 2<br>10 years imprisonment/$250,000 fine |

**Release Status:**   The defendant was arrested on January 20, 2021, in Ormond Beach, Florida. At his initial appearance hearing on January 20, 2021, he was released on an appearance bond in the United States District Court for the Middle District of Florida (Orlando) in Docket# 6:21mj01047-EJK. On March 9, 2021, the defendant made his initial appearance in United States District Court for the District of Columbia, at which time, he was to remain on personal recognizance. The defendant was remanded into custody on April 20, 2021, in which status he remains.

**Detainers:**   None.

**Codefendants:**   Ethan Nordean - 0090 1:21CR00175-001
Zachary Rehl - 0090 1:21CR00175-003
Charles Donohoe - 0090 1:21CR00175-004
Enrique Tarrio - 0090 1:21CR00175-005
Dominic Pezzola - 0090 1:21CR00175-006

**BIGGS**, Joseph                                                                                              **Page 3**

**Related Cases:**      Dominic J. Pezzola  - 0090 1:21CR00052-001
William Joseph Pepe  - 0090 1:21CR00052-002
Matthew Greene  - 0090 1:21CR00052-003

Joshua Pruitt – 0090 1:21CR00023-001
Daniel Scott – 0090 1:21CR00292-002
Jeremy Bertino - 0090 1:22CR00329-001

BIGGS, Joseph                                                                                          Page 4

## Identifying Data:

| | |
|---|---|
| **Date of Birth:** | January 8, 1984 |
| **Age:** | 39 |
| **Race:** | White |
| **Hispanic Origin:** | Non-Hispanic origin |
| **Sex:** | Male |

| | |
|---|---|
| **SSN#:** | 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 |
| **FBI#:** | 232176TC5 |
| **USM#:** | 26257-509 |
| **State ID#:** | North Carolina State ID#: NC1245606A |
| | Texas State ID#: TX16379214 |

**PACTS#: 7357211**

| | |
|---|---|
| **Marital Status:** | Married |
| **Education:** | Some College |
| **Dependents:** | 1[1] |
| **Citizenship:** | U.S. Citizen |
| **Country of Birth:** | United States |
| **Primary Language:** | English |

| | |
|---|---|
| **Legal Address:** | 114 Camino Circle, Ormond Beach, Florida 32174 |
| **Residence Address:** | DC Jail, 1901 D Street, SE, Washington, District of Columbia 20003 |
| **Telephone#:** | (803) 627-7808 – Kathy (nee: Miller) Hoellen |

| | |
|---|---|
| **Alias(es):** | Per NCIC: John Doe, Joseph R Biggs and Joseph Biggs |
| | Per Defendant: "Joe" |
| | True Name: Joseph Randall Biggs |

| | |
|---|---|
| **Alternate IDs:** | State DOC(Dept. of Corrections) Number: 385-326 |
| | South Carolina PACTS# 8509751 |
| | Eastern District of North Carolina PACTS# 7345523 |
| | Middle District of Florida PACTS# 7261681 |
| | Florida Driver's License: B200496840080 (Expires 01/08/2027) |

**Restrictions on Use and Redisclosure of Presentence Investigation Report.** Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

---

[1] Based on IRS Publication 501 definition for dependent(s) to include qualifying child or relative. All identified children, whether or not a dependent of the defendant, are included in Part C of this report.

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1.  On March 3, 2021, a federal grand jury in the District of Columbia returned a four-count Indictment charging Ethan Nordean, a/k/a "Rufio Panman," with Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 USC §§ 1512(c)(2) and 2 (Count One); Destruction of Government Property and Aiding and Abetting, in violation of 18 USC §§ 1361 and 2 (Count Two); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 USC §1752(a)(1) (Count Three); and Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 USC § 1752(a)(2) (Count Four).

2.  The Indictment does not provide notice to the defendant the Government intends to seek forfeiture as a part of the sentence. Rule 32.2(a) of the Fed. Rules of Crim Proc.

3.  The criminal conduct charged in each Count of the Indictment occurred on January 6, 2021.

4.  On March 10, 2021, a federal grand jury in the District of Columbia returned a six-count Superseding Indictment charging Ethan Nordean, a/k/a "Rufio Panman," Joseph Biggs, Zachary Rehl, and Charles Donohoe with Conspiracy, in violation of 18 USC §371[2] (Count One); Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 USC §§ 1512(c)(2) and 2 (Count Two); Obstruction of Law Enforcement During Civil Disorder and Aiding and Abetting, in violation of 18 USC §§ 231(a)(3) and 2 (Count Three); Destruction of Government Property and Aiding and Abetting, in violation of 18 USC §§ 1361 and 2 (Count Four); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 USC §1752(a)(1) (Count Five); and Disorderly Conduct in a Restricted Building or Grounds, in violation of 18 USC § 1752(a)(2) (Count Six).

5.  The Superseding Indictment does not provide notice to the defendants the Government intends to seek forfeiture as a part of the sentence. Rule 32.2(a) of the Fed. Rules of Crim Proc.

6.  The criminal conduct charged in Count One of the Superseding Indictment occurred from as early as November 3, 2020 through January 6, 2021. The remaining Counts occurred on January 6, 2021.

7.  Each defendant was named in each Count of the First Superseding Indictment.

8.  On March 7, 2022, a federal grand jury in the District of Columbia returned an eight-count Second Superseding Indictment charging Ethan Nordean, a/k/a "Rufio Panman," Joseph Biggs, Zachary Rehl, Charles Donohoe, Enrique Tarrio, a/k/a "Henry Tarrio," and Dominic Pezzola, a/k/a "Spaz," "Spazzo," and "Spazzolini," with Conspiracy to Obstruct Official Proceedings, in violation of 18 USC § 1512(k) (Count One); Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 USC §§ 1512(c)(2) and 2 (Count Two); Obstruction of Law Enforcement During Civil Disorder and Aiding and Abetting,

---

[2] The objects of the conspiracy were violations of 18 USC §1512(c)(2) and 18 USC §231(a)(3).

in violation of 18 USC §§ 231(a)(3) and 2 (Count Three); Destruction of Government Property and Aiding and Abetting, in violation of 18 USC §§ 1361 and 2 (Counts Four and Five); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 USC § 111(a) (Counts Six and Seven); and Robbery of Personal Property of the United States, in violation of 18 USC § 2112 (Count Eight).

9.    The Second Superseding Indictment does not provide notice to the defendants the Government intends to seek forfeiture as a part of the sentence. Rule 32.2(a) of the Fed. Rules of Crim Proc.

10.   The criminal conduct charged in Count One of the Second Superseding Indictment occurred from in and around December 2020 through in and around January 2021. The remaining Counts occurred on January 6, 2021.

11.   Ethan Nordean, Joseph Biggs, Zachary Rehl, Charles Donohoe, and Enrique Tarrio were named in Counts One through Seven of the Second Superseding Indictment. Dominic Pezzola was named in each count of the Second Superseding Indictment.

12.   On June 6, 2022, a federal grand jury in the District of Columbia returned a ten-count Third Superseding Indictment charging Ethan Nordean, a/k/a "Rufio Panman," Joseph Biggs, Zachary Rehl, Enrique Tarrio, a/k/a "Henry Tarrio," and Dominic Pezzola, a/k/a "Spaz," "Spazzo", and "Spazzolini" with Seditious Conspiracy, in violation of 18 USC §2384 (Count One); Conspiracy to Obstruct an Official Proceeding, in violation of 18 USC § 1512(k) (Count Two); Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 USC §§ 1512(c)(2) and 2 (Count Three); Conspiracy to Prevent an Officer from Discharging Any Duties, in violation of 18 USC §372 (Count Four); Obstruction of Law Enforcement During Civil Disorder and Aiding and Abetting, in violation of 18 USC §§ 231(a)(3) and 2 (Count Five); Destruction of Government Property and Aiding and Abetting, in violation of 18 USC §§ 1361 and 2 (Counts Six and Seven); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 USC § 111(a) (Counts Eight and Nine); and Robbery of Personal Property of the United States, in violation of 18 USC § 2112 (Count Ten).

13.   The Third Superseding Indictment does not provide notice to the defendants that the Government intends to seek forfeiture as a part of the sentence. Rule 32.2(a) of the Fed. Rules of Crim Proc.

14.   The criminal conduct charged in Counts One, Two, and Four of the Third Superseding Indictment occurred from in and around December 2020 through in and around January 2021. The remaining Counts occurred on January 6, 2021.

15.   Ethan Nordean, Joseph Biggs, Zachary Rehl, and Enrique Tarrio were named in Counts One through Nine of the Third Superseding Indictment. Dominic Pezzola was named in each count of the Third Superseding Indictment.

16.   On May 4, 2023, defendant Biggs was found guilty, by jury trial, as to Counts One, Two, Three, Four, Five and Six of the Third Superseding Indictment. He was found not guilty as to Count Nine, and a mistrial was declared on Counts 7 and 8.

17.   The defendant was arrested on January 20, 2021, in Ormond Beach, Florida.  At his initial appearance hearing on January 20, 2021, he was released on an appearance bond in the United States District Court for the Middle District of Florida (Orlando) in Docket# 6:21mj01047-EJK.  His release conditions required him to report to US Pretrial Services Agency (PSA); to not possess a firearm, destructive device or weapon; to surrender passport by January 22, 2021 and not obtain a passport or travel document; travel restricted to the Middle District of Florida and Washington, DC for court appearances; $25,000 unsecured bond for failure to appear or surrender as directed for service of any sentence imposed; comply with mental health assessment and treatment; drug testing and treatment if deemed appropriate; and to comply with location monitoring (home detention).

18.   On March 9, 2021, the defendant made his initial appearance in United States District Court for the District of Columbia, at which time, he was remained on personal recognizance. His release conditions required him to report to US Pretrial Services Agency (PSA) in Middle District of Florida as directed; to surrender  passport and not obtain a passport or travel document; travel restricted to the Middle District of Florida, court must approve all other travel; to avoid contact with any victims or witnesses; to obtain medical and or psychiatric treatment as directed; to not possess a firearm, destructive device or weapon; to not possess narcotic drug or other controlled substances; to submit to drug testing and comply with drug treatment if directed; to comply with location monitoring (home detention); to stay away from Washington, DC, except for Court, PSA and attorney meetings; and to verify address with PSA.  Pretrial Services Agency for the District of Columbia (PSADC) automated records revealed Mr. Biggs was in compliance. The defendant was remanded into custody on April 20, 2021, in which status he remains.

19.   According to Bureau of Prisons (BOP) automated records, Mr. Biggs did not incur any disciplinary infractions while at USP Lewisburg, Pennsylvania.

20.   According to records received July 27, 2023, from the District of Columbia, Department of Corrections, the defendant has not incurred any disciplinary infractions at this facility.

**The Offense Conduct**

21.   The information contained in this section was obtained from the various Indictments filed in this case, the Criminal Complaint, and additional information provided by the government. At all relevant times:

Background

22.     Defendants Enrique Tarrio, Ethan Nordean, Joseph Biggs, Zachary Rehl, Dominic Pezzola, and Charles Donohoe were leaders and prominent members of a national organization known as Proud Boys. The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Throughout the United States, there are local Proud Boys chapters, which are typically led by chapter "presidents." Each chapter had a degree of autonomy insofar as the president of a local chapter governs that chapter in its geographic location.

23.     Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group.  There is an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos and slogans to public events.

24.     Proud Boys have four degrees of membership: (a) First Degree members must take a public oath and declare himself a "Proud western chauvinist who refuses to apologize for creating the modern world;" (b) Second Degree members have been punched by multiple members until the person being assaulted can name five breakfast cereals; (c) Third Degree members reinforce their commitment to the organization by getting a Proud Boys' tattoo; (d) Fourth Degree members must get into a major battle for the cause.  As set forth in the Proud Boys organizational documents recovered from defendant Pezzola's home, those who are arrested "immediately become fourth degrees because the court has registered a major conflict" and "serious physical fights also count." Defendants Tarrio, Nordean, Biggs and Rehl were each Fourth Degree members.

25.     The Proud Boys was founded in 2016 by Gavin McInnes.  Mr. McInnes served as national chairman from 2016 until he stepped down in October 2018. At the time, a group of Proud Boys traveling with Mr. McInnes assaulted a group of counter-protestors on the Upper East Side of New York City. Defendant Tarrio was elected the national chairman following the resignation of Mr. McInnes. As the national chairman, defendant Tarrio continued to promote the Proud Boys as a group of men prepared to engage in violence. Defendant Tarrio was also the president of his local Proud Boys chapter in Miami, Florida, which was known as Vice City. Defendant Tarrio served as national chairman and president of his local Proud Boys chapter until at least January 6, 2021.

26.     Defendant Nordean, also known as "Rufio Panman," joined the Proud Boys and rose to national prominence after a video of him knocking a counter protestor unconscious during a rally in Portland, Oregon went viral in June 2018. From fall of 2020 until at least January 6, 2021, defendant Nordean was the President of his local chapter in Washington and a member of the Proud Boys "elders" – counsel of seven national leaders.

27.     Defendant Biggs, also known as "Sergeant Biggs," was an online personality, who appeared in InfoWars. He also reported on the riots in Ferguson, Missouri and stand-off at Bundy Ranch, Nevada.  Defendant Biggs was a member of the Proud Boys, and he assisted defendant Tarrio in organizing national rallies, including the rally in Portland, Oregon. Defendants Nordean and Biggs helped defendant Tarrio organize events.

**BIGGS**, Joseph                                                                          Page 9

28.   Defendant Rehl joined the Proud Boys in 2018 and was the President of the Philadelphia chapter in the lead-up to January 6, 2021. Defendant Rehl organized local rallies in Philadelphia in 2019 and 2020, and he organized his chapter's appearance in Washington, DC at rallies in 2019 and 2020.

29.   Defendant Pezzola joined the Proud Boys in November 2020 after attending an election related protest in Washington, DC. Defendant Pezzola joined a chapter in upstate New York and gained some national notoriety after a picture of him appeared in an article about the Proud Boys in a national newspaper.

Social Media Posts In Response to the 2020 Presidential Election

30.   Defendants Tarrio, Nordean, Biggs and Rehl used their platforms as leaders of the Proud Boys to publicly post statements in response to the projected results of the 2020 Presidential Election.

(a)   November 5, 2020 – Defendant Biggs posted "It's time for f** War if they steal this s**," referring to the Presidential election.

(b)   November 6, 2020 – Defendant Tarrio posted "The media constantly accuses us of wanting to start a civil war. Careful what the f** you ask for we don't want to start one…but we will sure as f** finish one."

(c)   November 12, 2020 – Defendant Tarrio posted "F** Unity. No quarter. Raise the black flag."

(d)   November 16, 2020 – Defendant Tarrio posted "If Biden steals this election, [the Proud Boys] will be political prisoners. We won't go quietly…I promise."

(e)   November 24, 2020 – Defendant Biggs, in response to a social media post calling for unity after the results of the presidential election, posted "No b**. This is war."

(f)   November 25, 2020 – Defendant Tarrio reposted a social media post by Joe Biden that stated, "We need to remember: We're at war with a virus – not with each other." Defendant Tarrio then posted, "No, YOU need to remember the American people are at war with YOU. NO Trump…No peace. No quarter."

(g)   November 27, 2020 - Defendant Nordean posted "We tried playing nice and by the rules, now you will deal with the monster you created. The spirit of 1776 has resurfaced and has created groups like the Proud Boys and we will not be extinguished. We will grow like the flame that fuels us and spread like love that guide us. We are unstoppable, unrelenting and now…unforgiving. Good luck to all you traitors of this country we so deeply love…you're going to need it."

(h)   November 27, 2020 – Defendant Rehl posted "Hopefully the firing squads are for the traitors that are trying to steal the election from the American people."

Proud Boys' Appearances at Previous Demonstrations in Washington, DC

31.    Defendant Tarrio along with members of the Proud Boys attended the Million MAGA March, an election related rally, in Washington, DC on November 14, 2020. Defendant Tarrio had previously told his followers that a "can of whoopa**" was in route to Washington, DC. Defendant Tarrio posted that the Proud Boys were "on the streets of DC" to "end" Antifa. Defendant Rehl, who was not present, posted videos of Proud Boys engaged in violence, including multiple videos of a member of the Proud Boys "smashing" a black woman in the face with a helmet, sending her to the ground bloody and motionless. Defendant Biggs, who was also not present, posted the same video and told his followers that the Proud Boys had "whipped commie a** and were victorious." Defendant Nordean, who was not present, posted a message within minutes of defendant Biggs and reported that the Proud Boys had "killed it in DC" and that more needed to be done to "run these scumbags out of our cities and anyone supporting them."

32.    Defendant Tarrio continued to promote the Proud Boys use of violence following the Million MAGA March. He appeared on InfoWars, where he celebrated the Proud Boys use of violence in Washington, DC. Defendant Tarrio commented favorably about videos of "my guys" engaged in massive melees in the streets of Washington, DC.

33.    On December 12, 2020, defendant Tarrio and other members of the Proud Boys attended the December Demonstration that focused on protesting the vote of the Electoral College on that upcoming Monday, December 14, 2020. During the rally, a group of Proud Boys stole a Black Lives Matter sign from Asbury United Methodist Church in Washington, DC. Defendant Tarrio joined his men in setting the sign ablaze in the intersection of 12th and I streets in downtown Washington, DC. Later that same evening, the Proud Boys viciously attacked a black man, who they believed was associated with Antifa. After being confronted, shoved, and punched in the face by a member of the Proud Boys, the black man pulled out a knife and continued to retreat. A large group of Proud Boys swarmed the man and beat him until he was left motionless on the ground. Defendant Pezzola was one of the men engaged in the attack. Police responded to the scene and broke up the fight. One of the officers stated the group would have killed the man had the police not intervened. During the victim's retreat, he stabbed four people, including coconspirator Jeremy Bertino. Defendants Tarrio, Nordean and Biggs used this incident to claim that the Proud Boys had been the victims of an attack and criticized the response by authorities in Washington, DC.

34.    Defendants Tarrio and Biggs celebrated Proud Boys' actions on social media. Defendant Tarrio posted that "[s]ilent big d** ninjas" were roaming the streets of Washington, DC and that Antifa had been running from the Proud Boys all night. Defendant Biggs posted online that he was in Washington, DC and "ready to rumble." In addition, defendant Biggs taunted the Federal Bureau of Investigation (FBI) and dared them to prosecute him for a "hate crime."

<u>Ministry of Self Defense (MOSD)</u>

35.    Although the leaders of the Proud Boys thought the December 12th rally was a success, leadership viewed the stabbings as a tactical failure, and they believed that the group's effectiveness had been hampered by a general lack of discipline among the rank-and-file. In a conversation with Proud Boys chapter Presidents following the rally, defendant Tarrio explained he had a "plan" to address the issue of "dudes not listening to a simple chain of command." Soon after, defendant Tarrio created the "Ministry of Self Defense (MOSD), a "national rally planning" chapter that would include only "hand selected members."

36.    MOSD included defendants Tarrio, Nordean, Biggs, Rehl and Donohoe. Immediately after forming the MOSD, defendant Tarrio and the leadership of the MOSD began preparations for January 6, 2021. Defendant Tarrio also created an encrypted Telegram group chat for MOSD leaders (MOSD Leaders Group), where MOSD leaders could communicate. Those leaders included defendants Tarrio, Biggs, Nordean, Rehl, as well as coconspirators Charles Donohoe, Jeremy Bertino and John Stewart. Defendant Tarrio also created another encrypted messaging group to recruit potential members of the MOSD (MOSD Prospect Group).

37.    To achieve MOSD's goals, defendant Tarrio implemented certain rules. First, members are "hand selected." Second members are subject to strict secrecy requirements. Third, members are required to observe the chain of command by following direct orders without question and by conforming to the general norms and expectations set by leadership.

<u>Planning of January 6, 2021</u>

38.    Defendant Tarrio and other leaders provided directions to MOSD members via Telegram groups and via a recorded video meeting. Members were ordered to not wear Proud Boys colors (yellow and black) on January 6, 2021, and instructed to acquire specific items of tactical and protective gear for use during the event.

39.    On December 27, 2020, defendant Nordean created an online crowdfunding campaign that solicited donations for "protective gear and communications" to be used by the Proud Boys on January 6, 2021. Defendant Nordean shared a link to this crowdsourcing campaign on his social media page and encouraged others to share it on their social media pages.

40.    On December 28, 2020, defendant Tarrio posted a message in the MOSD Prospect Group in which he stated the "DC trip" would consist of "two groups" – the MOSD and everyone else – and that no one should be in colors.

41.    On December 29, 2020, defendant Tarrio posted a message on social media that Proud Boys planned to "turn out in records numbers on January 6th but this time with a twist…We will not be wearing our traditional Black and Yellow. We will be incognito, and we will be spread across downtown DC in smaller teams. And who knows…we might dress in all BLACK for the occasion."

42.    On December 29, 2020, defendant Tarrio posted a message to the MOSD Prospect Group to notify prospective members of a virtual meeting on December 30th to explain "how this all works." Defendant Tarrio advised the group that the MOSD "will have a top down structure" and advised prospects that "if that's something you're not comfortable with" they should not bother attending the live session.  Defendant Tarrio advised that "upper tier relationship" would consist of a three-person "Operations" section led by defendant Rehl and two unnamed individuals.  Defendant Tarrio advised that the "Marketing" section would be led by defendant Tarrio, Biggs and Nordean. Defendant Tarrio advised that the "second tier" leadership would consist of eight regional members.

43.    On December 29, 2020, defendant Pezzola sent a direct message to defendant Tarrio on encrypted messaging system: "Hey boss, [I'm] one of the guys bringing the [decorative] shield down…I'll be in dc w a few other brothers from NY."

44.    On December 30, 2020, defendant Rehl posted a link to an online fundraiser with the campaign name of "Travel Expenses for upcoming Patriot Events." The campaign generated over $5,500 in donations between December 30, 2020 and January 4, 2021.

45.    Between December 30 and December 31, 2020, defendant Tarrio received a document from a girlfriend – titled "1776 Returns"- that contained plans calling for the occupation of government buildings in Washington, DC, including House and Senate office buildings on January 6, 2021.  Around this same time, defendant Pezzola visited coconspirator Bertino, who was released from the hospital after a December 2020 stabbing incident.  Defendant Pezzola delivered a decorative shield to coconspirator Bertino, and defendant Pezzola told coconspirator Bertino he had participated in beating the man who had attacked coconspirator Bertino. A few days later, coconspirator Bertino added defendant Pezzola to the MOSD.

46.    On January 1, 2021, defendant Tarrio posted messages that read, "Let's ring in this year with one word in mind. Revolt." And "New Years Revolution."

47.    On January 3, 2021, defendant Tarrio stated in the MOSD Leaders Group that he wanted to wait until January 4, 2021, to make final plans.

Defendant Tarrio's Arrest

48.    In late December 2020, defendant Tarrio learned that there was a warrant for his arrest for burning the Black Lives Matter sign.  On January 4, 2021, defendant Tarrio was arrested in Washington, DC and charged with Destruction of Property and Possession of Two Large Capacity Magazine in Superior Court for District of Columbia. Proud Boy leaders quickly learned of defendant Tarrio's arrest and began deleting the various encrypted chat groups in which the planning for January 6th was taking place. MOSD leaders, including defendants Nordean and Rehl, communicated to the membership that they should all clean up their chats and that the leaders destroy the original MOSD leaders and MOSD member groups. Defendant Donohoe then created a new group on the encrypted messaging application for MOSD leadership (New MOSD Leaders Group), which initially excluded defendant Tarrio.

49. Defendants Nordean and Biggs assumed direct operational control over MOSD, and they assured their subordinates that "the rally's continuing" and they had formed a "plan" in which they had consulted defendant Tarrio. In a private, encrypted message, defendant Nordean instructed his men to meet at the Washington Monument at 10:00am and that "from there" the men would be "marching to the Capitol."

50. On January 5, 2021, a member of the Proud Boys created a new encrypted messaging group entitled "Boots on Ground" to be used by members of the Proud Boys. On the same date, defendant Tarrio was released and ordered to leave the District of Columbia. Defendant Tarrio did not immediately leave District of Columbia. He met Elmer Stewart Rhodes III, founder and leader of the Oath Keepers and other individuals for approximately 30 minutes. Thereafter, defendant Tarrio left the District of Columbia and traveled to Baltimore, Maryland.

    Events of January 6, 2021

51. On January 6, 2021, at approximately 10:00am, a group of over 100 Proud Boys met at the Washington Monument. They did not wear Proud Boys' colors but were wearing tactical equipment such as helmets and plate carriers. Many were wearing t-shirts stating, "Enrique Tarrio did nothing wrong," a message supporting defendant Tarrio's participation in the burning of the Black Lives Matter sign.

52. Shortly after 10:00am, defendants Nordean, Biggs and Rehl left the planned speeches at the Ellipse and went towards the US Capitol. As the group walked past the front face of the US Capitol at approximately 11:20am, defendant Nordean announced, "We represent the spirt of 1776. If you haven't noticed, real men are here. We know what the oath is [unintelligible] to support and defend the Constitution…Let us remind those who have forgotten what that means." As the group marched past United States Capitol Police (USCP) officers at approximately 11:28am., defendant Biggs gave the group of officers the middle finger, and the defendants' men taunted the officers by yelling "treason" and warning the officers, "don't make us go against you." The group continued to the east side of the US Capitol. As the group stood on the east side of the US Capitol, one of the Proud Boys yelled out, "let's take the f** Capitol." That man was chastised and told not to "say" that.

53. While marching, defendant Rehl used his radio to ensure that the group of approximately 200 stayed together as they marched towards the US Capitol. He also communicated with coconspirators, who were not present, but who were monitoring events in Washington, DC remotely about how things were going on the ground, including whether journalists were following the group and the fact that they had not seen much Antifa presence.

54.     Shortly before noon, defendants Nordean and Biggs led the men back to the west side of the US Capitol. As they marched, defendants Nordean and Biggs led the men onto a four-lane road (First Street, NE and Constitution Avenue, NE) that was open to traffic. Defendant Biggs, Nordean and Rehl led the march to a group of food trucks located at approximately 2nd Street and Constitution Avenue, NW, arriving at approximately 12:10pm. There the group stopped and waited for approximately 30 minutes. At approximately 12:45pm, fifteen minutes before the certification of the Electoral College vote was scheduled to start, defendant Nordean and his men marched back toward the US Capitol.

55.     Defendants Biggs, Nordean, Rehl, Donohoe and their men arrived at the Peace Circle, at the edge of the restricted portion of the Capitol grounds at approximately 12:50pm. Prior to their arrival, the Peace Circle was uncrowded and relatively peaceful. Defendant Biggs led the crowd in chants that included "USA!," "Where's Antifa," and "Whose Capitol? Our Capitol!" Within minutes, the crowd grew and became more agitated. At approximately 12:53pm, defendant Biggs led "Whose Capitol? Our Capitol!" chant, as the crowd surged towards a police barricade that was manned by five officers. As the crowd surged forward, defendants Nordean and Biggs attempted to organize the men to stay with and follow them. Defendant Rehl moved to the front of the crowd while yelling, "F** them! Storm the Capitol!"

56.     Multiple Proud Boys participated in the clash with police at the Peace Monument. A Proud Boy member, who had been recruited by defendant Nordean, charged forward and held up a Proud Boys' hand gesture as the barricades fell. Codefendant Donohoe posted a video to the MOSD leaders chat group of him crossing the fallen barricades at the Peace Circle. Codefendant Donohoe stated, "Oops! Looks like we just stormed the Capitol building!" Coconspirator Bertino instructed the MOSD members, "Storming the capital right now!!" He gave the same instruction to the Boots on Ground chat, which was created for all Proud Boys members on January 6, 2021, and he told the men to "Get there."

57.     After the first barricades fell, members of the Proud Boys led the way onto Capitol grounds. Defendant Pezzola charged forward with Proud Boys from New York, and some of them removed barricades along the way. Defendant Rehl moved to the front and was surrounded by other Proud Boys. Defendant Nordean and Biggs moved through the crowd in a "stack" formation – hands on shoulders- with other Proud Boys and Proud Boys associates to reach the very front of the crowd. Defendants Nordean, Biggs, Rehl, Pezzola and their men were stopped by a black metal fence with law enforcement attempting to regroup on other side. With his men surrounding him, defendant Nordean yelled at the officers calling them "pigs" and "traitors." Defendant Rehl also yelled at the officers.

58.     Defendant Biggs and Nordean tore down the fixed black metal fence that separated the crowd from law enforcement. After tearing down the fence, defendants Nordean, Biggs, Rehl, Donohoe, Pezzola and others advanced past the trampled barrier into the west plaza of the Capitol grounds.

59.    In the West Plaza, US Capitol Police, some in riot gear, attempted to reform the line. Defendants Nordean, Biggs, Rehl and Pezzola positioned themselves at or near the front of the crowd in the west plaza.

60.    Defendants Nordean, Biggs, Rehl and Pezzola ignored the police officers' directives. Members of the crowd began to physically engage with law enforcement. As defendants Nordean, Biggs and Rehl watched the fighting, defendant Pezzola forcefully grabbed a riot shield from a USCP officer. Shortly thereafter, defendant Donohoe threw two water bottles at a line of police officers. Defendant Donohoe then united with defendant Pezzola and led defendant Pezzola to the rear of the plaza as they both carried the stolen riot shield. Defendant Donohoe took a picture of defendant Pezzola holding the stolen riot shield while making a hand gesture associated with the Proud Boys. Defendant Donohoe posted a message to the MOSD leaders he had the riot shield.

61.    At approximately 1:30pm, law enforcement regained some level of control of the West Plaza. Defendant Rehl stood with his men at the rear of the plaza, Defendants Donohoe and Pezzola stood nearby, and defendants Nordean and Biggs stood back on the lawn. Defendant Rehl observed law enforcement push the crowd back, at which time, defendant Rehl sent a text message to others that the crowd was at a "standstill." At approximately 1:36 p.m., defendants Pezzola and Donohoe's group moved forward through the crowd to a set of stairs that led to the Upper West Terrace. At approximately 1:43 pm, defendants Biggs and Nordean's group moved through the crowd to the same area. They were among dozens of other Proud Boys who had reunited at the base of the stairs. Those stairs led to the Upper West Terrace, which abutted the Capitol building and many doors and entrances to that building. At this entrance, which was under scaffolding, a small group of outnumbered officers guarded the foot of the stairs.

62.    Coconspirator Daniel Lyons Scott, a Proud Boy member, who had marched behind defendants Nordean, Biggs, and Rehl to the US Capitol, shoved two officers and pushed them up the stairs. Immediately, the crowd overwhelmed the officers and pushed up the scaffolding. Defendants Pezzola, Donohoe, and Biggs were among the surge of rioters to move up the concrete stair behind coconspirator Scott. Coconspirator Scott, along with multiple other Proud Boys who participated in the assault, displayed the Proud Boys hand gesture while celebrating immediately afterwards.

63.    Defendant Pezzola continued up the stairs with a mass of other rioters. He yelled at officers manning a barricade at the top of the stairs, "You better be f** scared. Yeah, you better be fucking scared…We ain't f** stopping…You better decide what side you're on mother**. You think Antifa's f** bad? Just you wait." After a brief struggle with the rioters, the police line gave way. Defendant Pezzola moved up the stairs and approached the building with a small group of rioters.  At approximately 2:13pm, defendant Pezzola used the stolen riot shield to break a window on the building. Defendant Pezzola was one of the first rioters to enter the building through that window.

64.    Defendant Pezzola joined the crowd as they chased Officer Eugene Goodman up a flight of stairs where the rioters engaged in a standoff near the Senate Chamber. As a result of rioters' entry into the building, the certification of the Electoral College was halted.

65.     Defendant Biggs, who had initially gone up the stairs under the Inaugural scaffolding, exited the stairs, briefly reunited with defendant Nordean, and then scaled a wall to go back up the stairs soon after rioters had reached the Upper West Terrace. Once on the terrace, defendant Biggs gestured back down to the ground to encourage those still on the ground to join him. Defendant Biggs entered the building with two other Proud Boys within minutes of defendant Pezzola entering the building. Defendant Biggs stole a drink from a small shop inside the US Capitol. A few minutes after entering, defendant Biggs exited the US Capitol on the east side and rejoined other Proud Boys.

66.     Defendant Nordean climbed the same set of concrete stairs and entered the Capitol's Upper West Terrace door at 2:37pm. Once inside, defendant Nordean moved around the Rotunda with other Proud Boys and two women who followed them. Defendant Nordean told a group of officers in the Rotunda that the "thin blue line" was "dead."

67.     Defendant Biggs then entered the US Capitol a second time, at approximately 2:38 p.m. this time at the Columbus Doors. Defendant Biggs and one of the Proud Boys, who had been with him during both of his entries into the US Capitol, separated upon entering the Columbus Doors. That Proud Boys member moved toward the Rotunda where he met defendant Nordean. Several members of the Proud Boys and the men they led to the US Capitol were in the location during the breach, including one man who sprayed officers with a chemical irritant. Defendant Biggs took advantage of the crowd's overwhelming numbers, and defendant Biggs made his second entry as part of a tactical line of four Proud Boys immediately after the crowd overwhelmed officers guarding the door. Defendant Biggs' group pushed directly past those officers, with defendant Biggs brushing up against one. Once inside, defendant Biggs and his men went to the Senate gallery. One of the men with defendant Biggs stole a flag from outside the Senate Chaplin's Office.

68.     Around the same time that defendant Pezzola was breaking the window near the Senate Wing Door, defendant Rehl remained in the West Plaza with a group of Proud Boys. While there, defendant Rehl moved toward a line of officers and sprayed a substance from a canister at an officer before quickly retreating into the crowd. The police line eventually gave way, and defendant Rehl and his group of Philadelphia Proud Boys advanced toward the US Capitol and up the same concrete stairs as defendants Biggs, Nordean, and Pezzola. Defendant Rehl's group posed for photographs flashing the Proud Boys hand gesture from the Upper West Terrace. While there, at approximately 2:30 p.m., defendant Rehl sent a text message to other Philadelphia Proud Boys that read, "Civil war started." Defendant Rehl then asked the Proud Boys he was with whether they wanted to go inside. At approximately 2:53pm, defendant Rehl's group entered the US Capitol through the Senate Wing Door. They went into a Senator's office, where posed for pictures while flashing the Proud Boys hand gesture.

69.     Defendant Tarrio attempted to call defendants Nordean and Biggs while they were inside the US Capitol. Defendant Biggs returned defendant Tarrio's call after exiting the Capitol building, and the call connected for 42 seconds. Shortly thereafter, defendants Biggs and Nordean reconnected and the two joined a group of six other Proud Boys and took a group photo with the US Capitol in the background. They threw up their Proud Boys hand signal and one of the men displayed an American flag that defendant Biggs' group had stolen

from outside the Senate chamber. Shortly thereafter, defendant Nordean walked to the E. Barrett Prettyman Federal Courthouse and posed for a picture with the American flag and a POW flag that his group had stolen from the Capitol Rotunda. Defendant Nordean held up a Proud Boys hand gesture for the photo.

70. At least two Proud Boys—one a member of MOSD and the other a member of Boots on Ground—participated in a violent attempt to overwhelm officers guarding an entrance to the Capitol in an area known as the "tunnel" on the Lower West Terrace.

71. From the start of the riot, the defendants and their co-conspirators celebrated their achievement of storming the US Capitol. Defendant Tarrio, who was monitoring the attack on the US Capitol from afar, posted encouraging messages to social media including "Proud of my boys and my country" and "Don't f** leave." Defendant Tarrio also privately claimed credit for the riot at the US Capitol, telling Proud Boys senior leadership, "Make no mistake . . . we did this." As noted above, defendants Biggs and Nordean posed with other Proud Boys on the west lawn of the Capitol for a celebratory video in which defendant Biggs stated that "January 6 will be a day in infamy." Defendant Rehl made social media posts calling January 6th a "historic day," and he told his mother he was "so f** proud" of the Proud Boys' "raid of the capitol." Defendant Pezzola, once inside the building, filmed a video of himself having a "victory smoke in the Capitol," and stating, "I knew we could take this mother** over if we just tried hard enough… Proud of your mother** boy."

Post January 6, 2021 Statements

72. The defendants' celebratory statements continued in the days that followed. On January 7, 2021, defendant Tarrio addressed the MOSD members, telling them he was "proud of y'all." Defendant Rehl likewise told the MOSD members he was "proud as f** what we accomplished yesterday." Defendant Biggs recorded a podcast-style interview in which he called January 6, 2021 a "warning shot" to the government that showed them "how weak they truly are" after being "b**-slapped on their own home turf." Defendant Nordean recorded a video of himself describing an encounter with a woman at the bar; in the video he faulted the woman for not appreciating that he "was part of f** storming the Capitol of the strongest country in the f** world… 1776, b**."

Obstructive Conduct by the Defendants

73. Then, as members of the MOSD began to be publicly identified and arrested, the defendants took steps to cover up their criminal conduct. MOSD Leaders directed others to clean-up, delete, or "nuke" the encrypted chats that had been used to plan and carry out the attack, including those used by the MOSD members.

74.    During an interview with the FBI on January 8, 2021, defendant Biggs denied going inside the US Capitol. After videos surfaced of defendant Biggs inside the US Capitol, defendant Biggs contacted the FBI and acknowledged being inside the US Capitol.  But he claimed that he went inside the US Capitol to find a bathroom and then he left. Defendant Biggs also claimed that he went inside by himself and did not know anyone that was with him. Defendant Biggs also claimed that he tore down the fence because he was trying to protect another rioter that was "pinned up" against the fence "literally screaming."

75.    After defendant Pezzola was identified in the media, defendant Pezzola initially took steps to avoid arrest before ultimately surrendering to authorities. As part of his initial flight, defendant Pezzola gave his phone, which included his encrypted messages with MOSD and others, to another individual. Defendant Pezzola's phone was never recovered. After defendant Pezzola's arrest, defendant Tarrio took steps to distance the Proud Boys from defendant Pezzola, which was intended to obstruct the investigation. Defendant Tarrio recorded a voice note that was passed on to defendant Pezzola through coconspirator Bertino. In the voice note, as reported by defendant Pezzola to the FBI and during his testimony, defendant Tarrio told defendant Pezzola to deny being a member of the Proud Boys.

76.    Defendant Tarrio went on national television to deny the Proud Boys' involvement in any plan to storm the US Capitol. After defendants Nordean, Biggs, and Rehl were arrested and charged with conspiracy, news reports surfaced that defendant Rehl might be cooperating with the investigation. Defendant Tarrio sent a message to other Proud Boys. Defendant Tarrio told them that he had spoken to defendant Rehl's wife and that defendant Rehl was not going to "flip." Defendant Tarrio told other Proud Boys that the "guys that are in prison right now" (e.g., Biggs, Nordean, Rehl, Pezzola) were "holding on to hope" that everyone was "f** staying put" and that the moment that they think that one guys flipped, it "makes everybody turn on each other" which was what "we are trying to f** avoid."

77.    At trial, defendant Rehl took the stand and swore that he rushed to the first street gate in order to find the "stages" for speeches at the US Capitol. Defendant Rehl also adamantly denied assaulting any officers on January 6, 2021. When defendant Rehl was confronted with video evidence of his assault, defendant Rehl continued to deny the act and then claimed to not remember any such assault.

78.    The defendants' own witnesses referred to January 6, 2021 as a positive day—with one witness stating that January 6 was "glorious." When defendant Tarrio was asked by a fellow Proud Boys member during the riot what was "next" for the group, defendant Tarrio declared that they should "do it again." Defendant Rehl testified to the jury: "at the time, I didn't think I did anything wrong" and then continued by explaining "as I sit here [in the witness box], I still believe that." In September 2021, on the day that defendant Tarrio reported to DC jail for burning the Black Lives Matter banner in the streets of DC, defendant Tarrio posed for a picture at the Peace Monument in which he held a lighter to the Capitol dome in the background. Defendant Tarrio wore a shirt that read, "@FREETHEPROUDBOYS . . . BY ANY MEANS NECESSARY."

BIGGS, Joseph                                                                Page 19

### Codefendants

79.  1:21CR00175-001 – Ethan Nordean - On May 4, 2023, a jury found him guilty as to Counts One, Two, Three, Four, Five, and Six of the Third Superseding Indictment. He was acquitted as to Count Nine. A mistrial declared on Counts Seven and Eight. Sentencing is scheduled for August 30, 2023.

80.  1:21CR00175-003 – Zachary Rehl - On May 4, 2023, a jury found him guilty as to Counts One, Two, Three, Four, Five, and Six of the Third Superseding Indictment. He was acquitted as to Count Nine. A mistrial declared on Counts Seven and Eight. Sentencing is scheduled for August 31, 2023.

81.  1:21CR00175-004 – Charles Donohoe – On April 8, 2022, he pled guilty to Counts One and Six of the Second Superseding Indictment. Sentencing is pending.

82.  1:21CR00175-005 – Enrique Tarrio - On May 4, 2023, a jury found him guilty as to Counts One, Two, Three, Four, Five, and Six of the Third Superseding Indictment. He was acquitted as to Count Nine. A mistrial declared on Counts Seven and Eight. Sentencing is scheduled for August 30, 2023.

83.  1:21CR00175-006 – Dominic Pezzola - On May 4, 2023, a jury found him guilty as to Counts Three, Four, Five, Six, Seven, Nine, and Ten of the Third Superseding Indictment. He was acquitted as to Count One. A mistrial declared on Counts Two and Eight. Sentencing is scheduled for September 1, 2023.

### Related Cases

84.  1:21CR00052-001 – Dominic J. Pezzola – The case remains pending.

85.  1:21CR00052-002 - William Joseph Pepe – A status hearing is scheduled for September 19, 2023.

86.  1:21CR00052-003 - Matthew Greene – On December 22, 2021, Mr. Greene pled guilty to Counts One and Two of the First Superseding Indictment charging him with Conspiracy, in violation of 18 USC § 371 (Count 1) and Obstruction of an Official Proceeding, in violation of 18 USC § 1512(c)(2) (Count 2). Sentencing is pending.

87.  1:21CR00023-001 – Joshua Pruitt – On June 3, 2022, he pled guilty to the charge of Obstruction of an Official Proceeding, in violation of 18 USC § 1512(c)(2). On August 29, 2022, he was sentenced to 55 months of imprisonment, 36 months of supervised release, and ordered to pay restitution in the amount of $2,000 and a $100 special assessment.

88.  1:22CR00329-001 -Jeremy Bertino – On October 6, 2022, Mr. Bertino pled guilty to Counts One and Two of the Information charging him with Seditious Conspiracy, in violation of 18 USC § 2384 (Count 1) and Unlawful Possession of a Firearm by a Prohibited Person, in violation of 18 USC § 922(g)(1) (Count 2). Status hearing scheduled on September 1, 2023.

**BIGGS**, Joseph                                                                                     **Page 20**

89.     1:21CR00292-002 – Daniel Scott – On February 9, 2023, Mr. Scott pled guilty to Counts One and Fifteen of the Second Superseding Indictment charging him with Obstruction of an Official Proceeding, in violation of 18 USC § 1512(c)(2) (Count 1) and Assaulting, Resisting, or Impeding Certain Officers, 18 USC § 111(a)(1) (Count 15). On July 12, 2023, he was sentenced to concurrent terms of 60 months incarceration, concurrent terms of 36 months supervised release, and ordered to pay restitution in the amount of $2,000 and a $200 special assessment.

### Role Assessment

90.     Based upon available information, it appears that Enrique Tarrio, Ethan Nordean, and Joseph Biggs all had leadership roles in the instant offense. Defendant Tarrio was the national leader of the conspiracy. Defendants Biggs and Nordean were defendant Tarrio's most trusted lieutenants and assumed control of the group following Enrique Tarrio's arrest on January 4, 2021. All three men were instrumental in recruiting others and organizing the group, including providing direction and exercising control, on the day of January 6, 2021. The government contends that defendants Tarrio, Biggs, and Nordean were organizers or leaders of a criminal activity that involved five or more participants, and their conduct warrants a four-level adjustment, pursuant to USSG §3B1.1(a).

91.     Defendant Rehl he was the president of the Philadelphia Proud Boys chapter and a national leader of the group organized by defendant Tarrio to return to Washington, DC on January 6, 2021. He directed and organized other members of the group, including in the use of communications equipment and encrypted communications, he also joined defendants Biggs and Nordean as a leader of the group that marched to the US Capitol and led a group of at least four other men into the Capitol. The government asserts that he was a manager or supervisor in the conspiracy which involved five or more participants, and his conduct warrants a three-level adjustment, pursuant to USSG §3B1.1(b).

92.     It does not appear that Dominic Pezzola had either an aggravating or mitigating role in the instant offense, pursuant to either USSG §§3B1.1 or 3B1.2.

93.     As a regional leader of the MOSD, defendant Donohoe followed the commands of those above him including codefendants Tarrio, Nordean, Biggs, and Rehl. As a regional leader, defendant Donohoe was responsible for recruiting trusted Proud Boys members to join the MOSD. Defendant Donohoe created new groups on encrypted messaging applications for MOSD leadership and MOSD members and instructed them to clear their prior chat history. The defendant was a manager or supervisor, and the criminal activity involved five or more participants or was otherwise extensive; therefore, a three-level adjustment for role in the offense is warranted, pursuant to USSG §3B1.1(b).

94.     Mr. Pruitt was not assessed either an aggravating or mitigating role adjustment at sentencing.

95.     Due to the pendency of his case, role information regarding William Joseph Pepe was not available.

96.  Defendant Matthew Greene traveled from Syracuse, with members of the Proud Boys from across the country and unlawfully entered the restricted area of the US Capitol grounds. Defendant Greene, participated with other rioters, including members of the Proud Boys, in moving police barricades out from under the scaffolding. However, based upon available information, it does not appear defendant Greene had an aggravating or mitigating role in the offense, pursuant to USSG §3B1.1 or §3B1.2.

97.  According to the plea agreements, Daniel Scott and Jeremy Bertino were not assessed an aggravating or mitigating role adjustment, pursuant to USSG §3B1.1 or §3B1.2

**Victim Impact**

98.  The provisions of the Mandatory Victim Restitution Act of 1996 apply to these Title 18 offenses. Counsel for the government advised that they may present victim information from law enforcement officers and from representatives from Congress and the Capitol building.  In addition, the defendants Nordean, Biggs, Rehl, Tarrio and Pezzola destroyed government property, specifically a fence.  As noted below, the government may seek restitution in the amount of $2,000 for damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

99.  This offense involved a large crowd of individuals who gathered outside the US Capitol, some of whom ultimately forced entry inside the building. Those individuals' actions included, but are not limited to, breaking windows, damaging property, and assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. According to the government, as of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The government may seek restitution in the amount of $2,000, payable to the Architect of the Capitol.

**Adjustment for Obstruction of Justice**

100.  During an interview with the FBI on January 8, 2021, defendant Biggs denied going inside the US Capitol. After videos surfaced of defendant Biggs inside the US Capitol, defendant Biggs contacted the FBI and acknowledged being inside the US Capitol.  However, he claimed that he went inside the US Capitol to find a bathroom and then he left. Defendant Biggs also claimed that he went inside by himself and did not know anyone that was with him. Defendant Biggs then claimed that he tore down the fence because he was trying to protect another rioter that was "pinned up" against the fence "literally screaming." Through video evidence and the continuing investigation, defendant Biggs' statements were identified as false. Considering defendant Biggs' made false statements to FBI while under investigation, a two-level adjustment is warranted, pursuant to USSG §3C1.1, comment (n.4(G)).

### Adjustment for Acceptance of Responsibility

101.    The defendant went to trial in this case and was found guilty by a jury. The defendant is eligible for a decrease in offense level if he clearly demonstrates acceptance of responsibility for his offense; however, pursuant to USSG §3E1.1, comment. (n. 2), an adjustment under this guideline is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying essential factual elements of guilt. The note acknowledges that, in rare situations, a defendant may clearly demonstrate acceptance of responsibility for his criminal conduct even though he exercises his right to a trial when he asserts issues not related to factual guilt. In this case, the defendant did not appear to proceed to trial based on issues unrelated to factual guilt. Therefore, he does not appear to qualify for a decrease under this guideline provision.

102.    Additionally, since an adjustment pursuant to USSG §3C1.1, Obstructing or Impeding the Administration of Justice, was applied in this case, that enhancement "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." However, there may be extraordinary cases in which adjustments under both USSG §§3C1.1 and 3E1.1 may apply, which is a determination that must be made by the Court.

### Offense Level Computation (2021 US Sentencing Guidelines)

103.    Count 1: Seditious Conspiracy, 18 USC §2384

104.    Count 2: Conspiracy to Obstruct an Official Proceeding, 18 USC § 1512(k)

105.    Count 3: Obstruction of an Official Proceeding, 18 USC § 1512(c)(2)

106.    Count 4: Conspiracy to Prevent an Officer from Discharging Any Duties, 18 USC §372

107.    Count 5: Obstructing Officers During a Civil Disorder, 18 USC § 231(a)(3)

108.    Count 6: Destruction of Government Property, 18 USC § 1361

109.    For Count 1, the guideline for 18 USC § 2384 offenses is found in USSG §2X5.1 of the guidelines. That section provides that if the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline. In this case, the most analogous offense guideline is USSG §2M1.1 (Treason). However, that guideline indicates that under §2M1.1(a)(2), if a defendant's conduct was not "tantamount to waging war against the United States," use "the offense level applicable to the most analogous offense." Accordingly, USSG §2J1.2 (Obstruction of Justice) was determined to be the most analogous offense.

110.    For Count 2, a violation of 18 USC § 1512(k), there is no guideline expressly promulgated. However, because the offense involves a conspiracy, the applicable guideline is USSG §2X1.1. Pursuant to USSG §2X1.1(c)(1), when the conspiracy is expressly covered by another offense guideline section, apply that guideline section which, for Count 2, the substantive offense is covered by USSG §2J1.2.

111.   The guideline applicable to Count 3 is USSG §2J1.2.

112.   The guideline applicable to Count 4 is USSG §2X1.1 and that guideline instructs to use the
       offense level for the substantive offense. For a conspiracy conviction for which the
       substantive offense is not covered by a specific guideline, use USSG §2X5.1. Under
       §2X5.1, since there is no applicable guideline, apply the most analogous. Based on the
       overall conduct and because the victims were the Members of Congress and law
       enforcement, the substantive offense is ultimately covered under USSG §2J1.2.

113.   The guideline applicable to Count 5 is USSG §2X5.1 and that section provides that if the
       offense is a felony for which no guideline expressly has been promulgated, apply the most
       analogous offense guideline. In this case, the most analogous offense guideline is USSG
       §2A2.4; however, the cross reference at USSG §2A2.4 notes that if the conduct constituted
       aggravated assault, apply USSG §2A2.2.

114.   The guideline applicable to Count 6 is USSG §2B1.1.

115.   Count Group 1: Obstruction of an Official Proceeding and Aiding and Abetting

116.   Counts 1, 2, 3, and 4 are grouped pursuant to USSG §3D1.2(b), because they involve the
       same victim (Congress/Government) and two or more acts or transactions connected by a
       common criminal objective or constituting part of a common scheme or plan.

117.   Counts 5 and 6 are then grouped with the other Counts pursuant to USSG §3D1.2(c),
       because those counts embody conduct that is treated as a specific offense characteristic in,
       or other adjustment to, the guideline applicable to another count.

118.   For Counts grouped pursuant to USSG §3D1.2(a)-(c), the offense level applicable to a
       Group is the offense level which produces the highest offense level. The guideline at USSG
       §2J1.2 produces the highest offense level.

       Count Group 1: Obstruction of an Official Proceeding and Aiding and Abetting

119.   **Base Offense Level:** The guideline for 18 USC § 1512(c)(2) offenses is found in
       USSG §2J1.2 of the guidelines and the base offense level is 14. USSG §2J1.2(a).      **14**

120.   **Specific Offense Characteristics:** The offense involved causing or threatening
       physical injury to a person in order to obstruct the administration of justice (to wit:
       the conspirators were among the first wave of rioters to breach the Capitol grounds
       and building and were part of a mob of rioters that caused injuries to Capitol Police
       officers guarding the outer perimeter at First Street. Conspirators tore apart a black
       metal fence on Capitol grounds, which allowed the first wave of rioters to continue
       advancing onto Capitol grounds and towards the Capitol building. They also led
       their men forward toward an outnumbered line of retreating law enforcement
       officers. The conspirators engaged in hand-to-hand combat with law enforcement
       officers who were guarding the US Capitol, and some used force to rob law
       enforcement officers of property. The conspirators overwhelmed a line of officers
       at the base of the scaffolding that led to the US Capitol building and threw objects

at police officers. They broke windows to access the Capitol building and achieve the objective of stopping the certification and used force to push past law enforcement officers who were guarding the doors of the US Capitol in order to gain entry to the US Capitol and stop the certification), therefore, eight levels are added. USSG 2J1.2(b)(1)(B). **+8**

121. **Specific Offense Characteristics:** The offense resulted in substantial interference with the administration of justice, specifically, the proceeding before Congress (to wit: Congress's certification of the Electoral College vote); therefore, three levels are added. USSG §2J1.2(b)(2). **+3**

122. **Specific Offense Characteristics:** The offense was otherwise extensive in scope, planning, or preparation (to wit: the seditious conspiracy began at least as early as December 19, 2020. Defendants Tarrio, Nordean, Biggs, Rehl, and other leaders of the Proud Boys organization intentionally recruited men prepared to engage in physical violence, if necessary. They organized a return to Washington, DC, which guidance included what to wear (e.g., no colors), what to bring (e.g., protective gear and communication equipment), and what to do (e.g., fit in or fuck off). They coordinated with men from across the country using encrypted messaging applications. Once on the ground, they continued to organize and direct the "boots on the ground" using a top-down command and control structure. They surveilled the US Capitol and then lay in wait for approximately 30 minutes until just before the certification was to commence. They marched scores of men to the west front of the US Capitol and then led the charge of those men onto the Capitol grounds; therefore, two levels are added. USSG 2J1.2(b)(3). **+2**

123. **Victim Related Adjustment:** None. **0**

124. **Adjustment for Role in the Offense:** The defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive (to wit: Defendant Biggs was a member of the Proud Boys. Defendants Nordean and Biggs assumed control of the Proud Boys following defendant Tarrio's arrest. Defendant Biggs was instrumental in recruiting others and organizing the group, including providing direction and exercising control, on the day of January 6, 2021); therefore, four levels are added. USSG §3B1.1(a). **+4**

125. **Adjustment for Obstruction of Justice:** Defendant Biggs willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice when he gave materially false statements to the FBI that significantly obstructed or impeded the official investigation or prosecution of the instant offense. Therefore, two-levels are added pursuant to USSG §3C1.1, comment. (n.4(D)). **+2**

126. **Adjusted Offense Level (Subtotal):** **33**

127. **Chapter Four Enhancement:** None. **0**

128. **Acceptance of Responsibility:** As of completion of the presentence investigation, the defendant has not clearly demonstrated acceptance of responsibility for the offense. USSG §3E1.1.                                                                 **0**

129. **Total Offense Level:**                                                                   **33**

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudication(s)

130.    None.

### Adult Criminal Conviction(s)

131.    None.

### Criminal History Computation

132.    The total criminal history score is zero. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of zero establishes a criminal history category of I.

### Traffic Infractions – Excluded Convictions

133.    Automated court records revealed on October 29, 2013, Mr. Biggs was charged with Speeding – 10MPH or Less Over The Speed Limit.  On December 2, 2013, he was found guilty and ordered to pay a $81 fine and court costs in 16th Judicial Circuit, York County, South Carolina (Case# 6557955).

134.    Accurint records reflect Mr. Biggs was charged with Speeding on July 27, 2002, in Manatee, Florida. Adjudication was withheld on November 25, 2002 (Case# 2002TR023166AX).

### Other Criminal Conduct

|      | Date of Arrest | Charge | Agency | Disposition |
|------|----------------|--------|--------|-------------|
| 135. | 07/31/2007 (Age 23) | Assault on a Female District Court, Cumberland Co., NC (2007CR 061068) | Cumberland Co. Sheriff's Office, NC | 08/30/2007: Dismissal without leave |

Due to the age of the case, court records no longer exist. Therefore, the circumstances of the offense are unknown.

BIGGS, Joseph                                                    **Page 26**

| 136. | 06/16/2012<br>(Age 28) | Resisting Arrest<br>General Sessions,<br>York Co., SC<br>(M604928) | York Co. Sheriff's<br>Office, SC | 02/25/2013:<br>Nolle Prossed |
|------|------|------|------|------|

According to the Indictment, on June 16, 2012, defendant Biggs knowingly and willfully opposed and resisted the efforts of Deputy Clevenger, a law enforcement officer.

Accurint records revealed defendant was also charged with Entering Premises After Warning or Refusal to Leave (Case# 42343GQ), Trespass (Case# 42342FQ) and Disorderly Conduct (Case# 42342GO).

| 137. | 09/06/2016<br>(Age 32) | Assault on Security<br>Officer<br>Municipal Court,<br>Travis Co., TX<br>(D1-DC-16-301459) | Travis Co. Sheriff's<br>Office, Austin, TX | 11/22/2016:<br>Dismissed |
|------|------|------|------|------|

The Affidavit For Warrant of Arrest and Detention revealed on or about February 8, 2016, at approximately 12:15am, a licensed security officer was on patrol when he was flagged down by Andres Oliver about defendant driving under the influence of alcohol. Mr. Oliver reported defendant almost hit his vehicle and other parked vehicles in the parking lot. When the officer approached the vehicle, the defendant exited the vehicle and appeared to be arguing with a female. When officer identified himself, the defendant stated, "What the h** do you want?" The officer then asked was everything okay because he had received a complaint about him almost hitting a parked vehicle. The defendant said everything was okay and to leave him alone. When officer questioned whether he had been drinking, the defendant stated, "Yes I have and what does it matter." The officer followed the defendant so that he could see what apartment he was going to because the officer wanted to include the apartment number in his report. The defendant became argumentative and yelled that he was a veteran, served his country, and that the officer must know who he is. The officer told the defendant to go inside of his apartment because he was disturbing the other residents. The defendant began yelling at the officer again and tried to poke the officer in the chest. The officer pushed his hand away and advised him not to touch him. The defendant then punched the officer in his forearm, which led to a physical altercation. With the assistance of Mr. Oliver the security officer was able to restrain the defendant.

**Pending Charges**

138.   None.

**Other Arrests**

139.   None.

## PART C. OFFENDER CHARACTERISTICS

### Personal and Family Data

140.   The presentence interview was conducted on July 13, 2023, with the defendant via telephone in the presence counsel.   Attempts to contact the defendant's immediate family members have not been conducted prior to submission of the draft presentence report. Any contact with the defendant's family will be included in the finalized presentence report. The defendant has not submitted signed releases of information; therefore, independent verification requests have not been forwarded.

141.   On January 8, 1984, Joseph Randall Biggs was born to the marital union of Michael Wayne Biggs and Kathy (nee: Miller) Hoellen in Gastonia, North Carolina.  The defendant's father is between 67 and 70 years old and lives in Clearwater Beach, Florida.  He is a veteran of the United States Marine Corp. The defendant's mother, age 65, lives in Ormond Beach, Florida and is Associate Vice President at Daytona State College in Daytona Beach, Florida.  Reportedly, the defendant's father has had multiple heart attacks, and his mother was diagnosed with breast cancer in 2018 but is in remission.

142.   The defendant's paternal sister, Shannon Sorenson, is younger than him and lives in Omaha, Nebraska.  Mr. Biggs does not know her occupational status.  The defendant has had contact with Shannon only a few times, with the last time in 2016 or 2017.

143.   The defendant stated he was approximately seven years old when his parents divorced due to his father's infidelity.  At this juncture, the defendant's mother became his primary caretaker and she ensured he had the basic material necessities.  The defendant's childhood was devoid of any abuse, and he never witnessed any domestic violence.  Mr. Biggs stated he had "very good" childhood.

144.   The defendant was approximately 17 years old, when his mother married Lee Hoellen.  In 2017, Mr. Hoellen died from non-Hodgkin's lymphoma at the age of 71.  Mr. Biggs stated he has a very good relationship with his mother, a "non-existent" relationship with his father, and an amicable relationship with his stepfather. Mr. Biggs lived in Townville, South Carolina, a rural area, for most of his childhood.

145.   Under the advisement of counsel, the defendant did not provide any details about his involvement with the Proud Boys.

146.   In 2004, the defendant married Lori Wolfe in Fayetteville, North Carolina.  Ms. Wolfe is 35 years old.  The defendant stated they separated in 2009 and divorced the following year due to her infidelity. The defendant does not know Ms. Wolfe's current whereabouts or occupational status.  Mr. Biggs and Ms. Wolfe do not have any children together.

147.   In August 2015, the defendant married Melissa Biggs in Austin, Texas.  Ms. Biggs, age 35, lives in Ormond Beach, Florida and does computer coding.  Mr. Biggs and his wife have a healthy six-year-old daughter, Savannah Biggs, who is in the first grade. The defendant stated in 2018, he and his wife separated due to irreconcilable differences but maintain a cordial relationship.

148. Reportedly, the defendant lived in Gastonia, North Carolina; Charlotte, North Carolina; Townville, South Carolina; Clemson, South Carolina; Austin, Texas; and Ormond Beach, Florida[3]. Mr. Biggs could not recall how long he lived in North Carolina and South Carolina, but he lived in Texas from 2014 until 2018 for work purposes. The defendant stated in 2018, he moved to Florida to help his mother who was suffering from cancer and had recently lost her husband. From 2018 until his arrest in the instant case, the defendant was living at 114 Camino Circle, Ormond Beach, Florida with his former girlfriend and a roommate. The defendant stated since his arrest in the instant case, his wife and daughter have been living at his house, but this is a temporary living arrangement. Upon the defendant's release from custody, he intends on returning to his house. A home verification has been requested and a response from the US Probation Office in the Middle District of Florida is pending.

**Physical Condition**

149. The defendant is 5 feet 9 inches tall and weighs approximately 213 pounds. He has green eyes and gray hair. Mr. Biggs has the following tattoos: statute of liberty, "E6," and 82nd airborne patch – right arm; M4 weapon, 82nd airborne crest, cross and wings – left arm; Valknut symbol and helm of awe – chest; combat action badge and grim reaper – back; skull with Vietnam style helmet – left calf; and small diamond – right hand. The defendant is nearsighted and wears corrective lenses.

150. The defendant related in 2006, he severed his anterior cruciate ligament (ACL), and on September 26, 2006, he suffered traumatic brain injury while deployed in Iraq. In addition, Mr. Biggs sustained multiple injuries to his right knee and right foot while in the military. Reportedly, he had metal pins placed in his foot in approximately 2011. Mr. Biggs could not recall the name of the medical facility, but the orthopedic surgery was performed in Daytona Beach, Florida. The defendant stated he has received most of his medical treatment from William V Chappell, Jr. Veterans Outpatient Clinic in Daytona Beach, Florida. The defendant stated while at DC Jail, he has been prescribed Ibuprofen for pain.

151. Mr. Biggs stated in 2007, he was diagnosed with severe sleep apnea, and prior to his arrest in the instant case, he used a Continuous positive airway pressure (CPAP) machine.

152. Mr. Biggs has no known allergies. He contracted COVID in January 2022 and is not vaccinated. The defendant has a paternal history of heart issues, and a maternal history of breast cancer and Alzheimer.

---

[3] A review of National Crime Information Center (NCIC) automated records reflects the defendant, at some point, was issued a driver's license in North Carolina (No. 33101954); South Carolina (No. 11247453), and Texas (No. 40197759).

### Mental and Emotional Health

153.    The defendant stated after his traumatic brain injury, he saw a counselor at Veteran Administration in Daytona Beach, Florida.  Reportedly, he was diagnosed with Post Traumatic Stress Disorder (PTSD) and had a 10% disability rating from 2006 until 2020. The defendant indicated as of 2020, he no longer has a PTSD diagnosis. Mr. Biggs stated at one time, he was prescribed Zoloft but has not taken the medication in several years.  He was not familiar with any family history of mental illness.

154.    According to Wikipedia, Mr. Biggs issued a statement to Raw Story.  He stated, "I became very depressed and turned to alcohol and the over abuse of painkillers that had been prescribed to me while I was in." He also reported he was suicidal at that time, and "decided to cry out for help," admitting that "I would say outlandish things on Twitter in hopes someone shocked would say 'Hey, what the hell is wrong with you?'"

### Substance Abuse

155.    The defendant admitted to smoking marijuana a few times at age 16, and he started drinking alcohol at approximately 17 years old.  Mr. Biggs regularly consumed alcohol, primarily beer, from 2004 until 2020.  He drank "a few" beers a day, with the last time being January 19, 2021 (the day before his arrest in the instant case).

156.    The defendant stated he used cocaine and ecstasy "off and on" between 2002 and 2004, and a few times between 2014 until January 2021.  Mr. Biggs described his cocaine and ecstasy use as an "occasional thing."

157.    The defendant stated in 2007, he completed a mandatory substance abuse class while in the military.  Mr. Biggs explained he was not referred to the class due to substance abuse issues, but it was required for soldiers who had been deployed to Iraq.  Mr. Biggs does not believe substance abuse treatment is warranted, but he is amenable to it.

### Educational, Vocational and Special Skills

158.    Aside from English, the defendant is not proficient in any other languages. The defendant stated he attended Oconee Christian Academy in Seneca, South Carolina during his middle and high school years.  Mr. Biggs explained when he moved to Florida, he was to enroll in Manatee High School in Bradenton, Florida but opted to pursue his General Educational Development (GED) diploma through an unspecified correspondence program. Reportedly, Mr. Biggs received his GED in approximately 2002. Reportedly, the defendant attended Manatee Community College in Bradenton, Florida, where he majored in Mass Communications.  He could not recall the years he attended Manatee Community College, but he discontinued his education to work.

159.   Mr. Biggs advised in approximately 2004, he received his emergency medical technicians (EMT) training from Fayetteville Technical Community College in Fayetteville, North Carolina. The defendant stated he recertified his EMT certification in Iraq, but it has since expired. A review of the public website maintained by the National Registry of Emergency Medical Technicians did not yield any results for the defendant of either an active, lapsed, or inactive license.

160.   The defendant advised from 2011 until 2014, he took several industrial engineering and welding classes at York Technical College in South Carolina, but he did not complete the program. Mr. Biggs stated it was difficult managing work and school, so he discontinued his education.

161.   A review of NCIC automated records revealed the defendant was issued a concealed weapon license (No. CH-06614752) on or before August 11, 2016.

**Employment Record**

162.   At the time of the defendant's initial arrest (January 2021), the defendant was employed. At the time of sentencing, the defendant will be unemployed due to his custodial status.

163.   Reportedly, Mr. Biggs enlisted in the United States Army on November 4, 2004 and was medically discharged on February 14, 2013. His highest rank and rank at separation was Staff Sergeant (E6). His specialty was field artillery, but he spent most of his military career assigned to a small tactical unit that focused on maneuver element[4]. In addition, the defendant was a Master Driver, who taught military vehicle driving courses, issued military driving licenses, and performed maintenance of military vehicles. Reportedly, Mr. Biggs received several decorations and awards throughout his military career: Purple Heart (from traumatic brain injury in Iraq), multiple good conduct medals, combat action badge, an award from former President Obama for his work on the sexual assault preventative team and presidential unit citation from former President George W Bush. The defendant stated he medically retired from the Army on February 14, 2013, and prior to his arrest, he received between $1,600 and $1,800 in monthly benefits.

164.   The defendant stated while on leave from the military, he secured a part-time job reviewing clubs, restaurants and stores' security surveillance equipment and procedures, and made various safety and security recommendations. Additionally, he supervised security details at various entertainment venues. He could not recall the name of the company, but it was based in Charlotte, North Carolina and he earned $12 hourly.

165.   Mr. Biggs stated from 2014 until 2017, he earned $90,000 annually as a field reporter/investigator journalist for Info Wars in Austin, Texas. The defendant conveyed he left because he wanted to spend more time with his family.

---

[4] According to Wikipedia, maneuver element is composed of troops armed with assault rifles, entrenching tools, grenades, and additional ammunition for the machine gun and tasked with the role of enabling the safe movement of the fire element by scouting ahead and providing a security detail.

166. The defendant advised from 2018 until his arrest in the instant case, he had a podcast on Censored.TV, where he discussed politics, suicide, survivor guilt and many other veteran related issues. Mr. Biggs stated he conducted approximately two to three podcasts a week, averaging $500 per podcast.

167. According to Wikipedia, the defendant hosted a show on Censored.TV that has since been removed from that website.

### Social Media

168. Mr. Biggs stated he does not have any social media accounts. Wikipedia noted Mr. Biggs' Twitter account was blocked after posting threatening comments about Antifa.

### Financial Condition: Ability to Pay

169. The information contained on the Net Worth Statement was obtained from the defendant on July 13, 2023; however, he was unable to provide documentation due to his custodial status. Additional independent research was conducted through a national comprehensive report (Accurint). Mr. Biggs has not consented to the release of his credit report. The defendant retained counsel. He is paying his legal fees through a third party.

170. The defendant did not report any cryptocurrency accounts, credit cards or loans, but he has a checking account with Valley Star Federal Credit Union with an unspecified balance. Accurint records did not reveal any liens, judgment, or bankruptcy filings in the defendant's name.

171. Mr. Biggs owns 2007 Toyota Tundra and 2007 Kawasaki Ninja sports bike. Mr. Biggs advised his vehicle and bike are lien free. Additionally, commercial government tracking sources confirmed Mr. Biggs is the registered owner of 2007 Kawasaki ZX1400 (VIN# JKBZXNA1X7A022444) and 2007 Toyota Tundra (VIN# 5TFRT54117X005174). Kelly Blue Book (KBB) on 2007 Kawasaki ZX-14 is $7,360, and private party value on a 2007 Toyota Tundra, with approximately 96,000 miles, is $12,595.

172. Accurint records noted Mr. Biggs was the registered owner of a 1992 Oldsmobile Cutlass Supreme (VIN# 1G3WH54T4ND359176), 2005 Suzuki C50 (VIN# JS1VS55A952114888), 2006 Toyota Camry (VIN# 4T1BE32K86U154415), 2007 Toyota Scion (VIN# JTKDE177870188474), 2012 Yamaha XV1900 (VIN# JYAVP22E7CA010315), 2016 Harley Davidson FLSS (VIN# 1HD1JS913GB012486) and 2020 Kawasaki EX650 (VIN# ML5EXEN12LDA08269).

173. The defendant stated in 2019, he purchased his home located at 114 Camino Circle, Ormond Beach, Florida for $220,000. Commercial government tracking sources reflect Mr. Biggs and his mother, Kathy Lynn Hoellen, jointly own 114 Camino Circle, Ormond Beach, Florida. The property was purchased on May 31, 2019 for $197,500. However, Volusia County Property Appraiser online records list the defendant's mother as the property owner. According to Accurint and Volusia County Property Appraiser, the total market value is $263,480. However, a search of www.zillow.com revealed an estimated fair market value of $310,000.

174.  As of July 26, 2023, Mr. Biggs has $4,570 in a GiveSendGo account, which was created by Condemned USA.

175.  The defendant advised he has consistently filed income taxes as required. Records were not independently obtained from the Internal Revenue Service by the Probation Office.

176.  The United States District Court for the District of Columbia automated records revealed the District of Columbia is requesting injunctive relief, compensatory, statutory, and punitive damages as awarded by a jury, and costs and attorney's fees in Docket No. 1:21cv03267. On September 30, 2022, the Court stayed this matter pending the conclusion of a trial in United States v. Rhodes, III, et al., Docket No. 1:22CR00015. The stay was lifted on January 24, 2023.  On March 31, 2023, the Court ordered the defendant's various motions were granted in part and denied in part. The Court also dismissed the alleging violations of § 1985 (Counts I) and § 1986 (Count II), but the District may proceed on its civil conspiracy claims (Counts III–V). Also, the court dismisses the District's prayer for permanent injunctive relief.

177.  Based upon the defendant's financial profile, it appears he does not have the resources to pay a fine in addition to any imposed restitution.

## PART D. SENTENCING OPTIONS

### Custody

178.  **Statutory Provisions:** Count 1: The maximum term of imprisonment is 20 years for this Class C Felony. 18 USC § 2384.

179.  Count 2: The maximum term of imprisonment is 20 years for this Class C Felony. 18 USC § 1512(k).

180.  Count 3: The maximum term of imprisonment is 20 years for this Class C Felony. 18 USC § 1512(c)(2).

181.  Count 4: The maximum term of imprisonment is six years for this Class D Felony. 18 USC § 372.

182.  Count 5: The maximum term of imprisonment is five years for this Class D Felony. 18 USC § 231(a)(3).

183.  Count 6: The maximum term of imprisonment is 10 years for this Class C Felony. 18 USC § 1361.

184.  **Guideline Provisions:** Based upon a total offense level of 33 and a criminal history category of I, the guideline imprisonment range is 135 months to 168 months.

185.    However, the statutorily authorized maximum sentence for Count 4 is less than the minimum of the guideline range, the guideline range is 72 months on Count 4. USSG §5G1.1(a). Since the statutorily authorized maximum sentence for Count 5 is less than the minimum of the guideline range, the guideline range is 60 months on Count 5. USSG §5G1.1(a). Because the statutorily authorized maximum sentence for Count 6 is less than the maximum of the guideline range, the guideline range is 120 months on Count 6. USSG §5G1.1(a).

186.    The court shall determine the total punishment and shall impose the total punishment on each count, except to the extent otherwise required by law. USSG §5G1.2(b). If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law. USSG §5G1.2(c).

**Impact of Plea Agreement**

187.    The defendant proceeded to trial in this case.

**Supervised Release**

188.    **Statutory Provisions:** Counts 1 - 6: The Court may impose a term of supervised release of not more than three years, per count. 18 USC § 3583(b)(2).

189.    Multiple terms of supervised release shall run concurrently. 18 USC § 3624(e).

190.    **Guideline Provisions:** Counts 1 – 3 and 6: Since these offenses are Class C Felonies, the guideline range for a term of supervised release is 1 year to 3 years, per count. USSG §5D1.2(a)(2).

191.    Counts 4 and 5: Since these offenses are Class D Felonies, the guideline range for a term of supervised release is 1 year to 3 years, per count. USSG §5D1.2(a)(2).

192.    If a sentence of imprisonment of one year or less is imposed, a term of supervised release is optional. USSG §5D1.1(b). Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute. USSG §5D1.1(a).

193.    In addition to the mandatory and discretionary conditions of supervision, 18 USC § 3563(a) and (b), the Court may impose other conditions as they relate to the nature and circumstances of the offense and the history and characteristics of the defendant. 18 USC § 3553(a)(1).

194.    In consideration of the above, the Court may impose all or a combination of the following additional conditions: given the nature and circumstances of the offense, (a) contact restriction; (b) social media restriction; (c) propaganda restriction; (d) computer monitoring/search and (e) telecommunications restriction; (f) financial disclosure and restrictions to ensure payment of the financial obligations; and (g) drug testing based upon his history of drug use.

195.   The probation office researched available programs within the Bureau of Prisons (BOP) and recommends the defendant participate in the following during the period of incarceration:

196.   <u>Drug Abuse Education Program</u>:  This program is designed to encourage inmates with a history of drug use to review the consequences of their choice to use drugs and the physical, social, and psychological impacts of this choice.   Drug Abuse Education is not drug treatment. Inmates are required to participate in Drug Abuse Education if any of the following criteria are met: their substance use contributed to the instant offense; their substance use resulted in a supervised release violation; a significant substance use history is noted; or a judicial recommendation for substance abuse treatment is noted. Additionally, any inmate may volunteer to take the course. All Bureau facilities offer the Drug Abuse Education Program.

197.   <u>Parenting Program</u>:   This program is designed to provide inmates information and counseling through directed classes on how to enhance their relationship with their children even while incarcerated.   All inmates are afforded the opportunity to participate in the Parenting Program. All Bureau facilities offer the Parenting Program.

198.   <u>Life Connections Program</u>: This is a residential faith-based program offered to inmates of all faith traditions, including for those who do not hold to a religious preference. The goal of LCP is to provide opportunities for the development and maturation of the participants' commitment to normative values and responsibilities, resulting in overall changed behavior and better institutional adjustments. Program admission criteria are as follows: Low security male inmates within 24 to 36 months of their projected release date; Medium security male inmates with 24 months or more prior to their projected release date; High security male inmates with 30 months or more prior to their projected release date; Low security female inmates with 30 months or more prior to their projected release date; Must not have a written deportation order; Must not be on Financial Responsibility Program (FRP) Refuse status; Must have met English-as-a-Second Language (ESL) and GED obligations; and Must receive recommendation from relevant staff (Chaplain, Unit Team, and Associate Warden) and approval from the Warden. The LCP is available at FCI Petersburg, VA-Low; USP Leavenworth, KS-Medium; FCI Milan, MI-Low; USP Terre Haute, IN-High; and FMC Carswell, TX-Adm. (F).

### **Probation**

199.   **Statutory Provisions:**  Counts 1 – 3 and 6: The defendant is eligible for not less than one nor more than five years probation, per count, because these offenses are Class C Felonies. 18 USC § 3561(c)(1). One of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service.

200.   Counts 4 and 5: The defendant is eligible for not less than one nor more than five years probation, per count, because these offenses are Class D Felonies. 18 USC § 3561(c)(1). One of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service.

201.   Multiple terms of probation shall run concurrently. 18 USC § 3564(b).

202.   **Guideline Provisions:** Since the applicable guideline range is in Zone D of the Sentencing Table, the defendant is ineligible for probation. USSG §5B1.1, comment.(n.2).

## Conditions of Supervision

203.   The following conditions listed in the most recent revision of the Judgment in a Criminal Case (Form AO 245B), establish the basic expectations for an individual under supervision, identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvement in the conduct and condition of the person under supervision, as required under 18 USC § 3603. These conditions are reasonably related to the sentencing factors set forth in 18 USC § 3553(a)(1) and (a)(2)(B), (C), and (D); such conditions involve no greater deprivation of liberty that is reasonably necessary for the purposes set forth in § 3553(a)(2)(B), (C), and (D); and such conditions are consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to 28 USC § 994a.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of the time you were sentenced, or within 72 hours of release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4.  You must answer truthfully the questions asked by your probation officer.

5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the

probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

13. You must follow the instructions of the probation officer related to the conditions of supervision.

### Mandatory Drug Testing

204. The Violent Crime Control and Law Enforcement Act of 1994 requires an individual under supervision, whose offense occurred after September 13, 1994, refrain from the unlawful use of a controlled substance; submit to one drug test within fifteen days of the commencement of supervision; and two additional periodic drug tests. The condition for mandatory drug testing may be ameliorated or suspended by the Court if reliable sentencing information indicates a low risk of future substance abuse by the defendant. 18 USC §§ 3563(a)(5) and 3583(d).

### DNA Requirement

205. Pursuant to 42 USC § 14135a(a)-(d), for all felony offenses, the defendant shall submit to the collection and use of DNA[5] identification information while incarcerated in the Bureau of Prisons, or at the direction of the U.S. Probation Office.

---

[5] According to BOP automated records, on June 15, 2023, the defendant provided a sample of his DNA (sample number LEW04988).

### Fines

206.  **Statutory Provisions:** Counts 1 - 6: The maximum fine is $250,000, per count. 18 USC § 3571(b).

207.  A special assessment of $100, per count, is mandatory. 18 USC § 3013.

208.  **Guideline Provisions:** The fine range for this offense is from $35,000 to $250,000. USSG §§5E1.2(c)(3) and (4).

209.  In determining the fine amount, the Court shall consider, among other factors, the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence. 18 USC § 3572(a)(6) and USSG §5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests that the Court use a monthly cost of $3,688.00 for imprisonment, a monthly cost of $2,980.00 for community confinement, and a monthly cost of $371.00 for supervision.

### Restitution

210.  **Statutory Provisions:** Pursuant to 18 USC § 3663A, restitution shall be ordered in this case. The defendant has not entered into an agreement to restitution; however, the Government may seek restitution.

211.  **Guideline Provisions:** Restitution shall be ordered. USSG §5E1.1.

### PART E. SENTENCING FACTORS

212.  Pursuant to the Sentencing Reform Act of 1984, the Court must select a sentence from within the guideline range unless the case presents atypical factors and then the Court can depart from the guidelines and impose a sentence outside of the prescribed range. The Sentencing Guidelines provide for departures in Chapter Five – Part H based on specific offender characteristics which can involve a range of considerations. Additionally, Chapter Five – Part K provides for departures based on other grounds which allow the Court to depart if an aggravating or mitigating circumstance exists that is not adequately taken into consideration by the guidelines.

213.  In this case, the Probation Office has reviewed the factors outlined in Parts H and K of the Chapter Five and has identified the following factor for the court's consideration; however, presentation of the information does not necessarily reflect a recommendation by the Probation Office. Pursuant to USSG §3A1.4, comment.(n.4), an upward departure may be warranted if the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or retaliate against government conduct but the offense involved, or was intended to promote, an offense other than one of the offenses specifically enumerated in 18 USC § 2332b(g)(5)(B).

214.    Pursuant to 18 USC § 3553(a), the Court shall impose a sentence sufficient, but not greater
        than necessary, to reflect the nature and circumstances of the offense and the history and
        characteristics of the defendant; to promote respect for the law and to provide just
        punishment for the offense; to afford adequate deterrence; to protect the public from further
        crimes of the defendant; and to provide the defendant with needed educational/vocational
        training, medical care or other correctional treatment. As a result of the presentence
        investigation, the Probation Office has not identified any factors that would warrant a
        variance from the applicable guideline range based on the factors outlined in 18 USC §
        3553(a).

215.    **Judiciary Sentencing Information (JSIN):** During the last five fiscal years (FY2018-
        2022), there was an insufficient number of defendants (1) whose primary guideline was
        §2J1.2, with a Final Offense Level of 33 and a Criminal History Category of I, after
        excluding defendants who received a §5K1.1 substantial assistance departure; and (2) who
        received a sentence of imprisonment in whole or in part.


                        Respectfully Submitted,

                        **BRIAN D. SHAFFER**
                        **CHIEF UNITED STATES PROBATION OFFICER**


                By:     Sherry  Baker
                        Senior United States Probation Officer
                        (202) 565-1327


Approved:




Renée Moses-Gregory                    Date
Supervisory United States Probation Officer
(202) 565-1348