**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

ENRIQUE TARRIO, *et al.*,

Plaintiffs,

v. CASE NO. 6:25-cv-0998-AGM-DCI

UNITED STATES OF AMERICA, *et al.*,

Defendants.
_________________________________/

**DEFENDANTS' OPPOSITION TO MOTION**
**FOR DISCOVERY AND EVIDENTIARY HEARING**

The United States of America and FBI Special Agent ("SA") Nicole Miller oppose Plaintiffs' request for discovery and an evidentiary hearing on whether SA Miller was acting in the scope of her employment for purposes of the malicious prosecution claim. First, Plaintiffs' factually unsupported, conclusory allegations do not satisfy their burden of rebutting the Government's certification that SA Miller was acting in the scope of employment. Second, even if the allegations were true and fairly attributed to SA Miller, the alleged conduct still falls within the scope of employment under D.C. law. With no factual issues to resolve, discovery and an evidentiary hearing are both unnecessary.

**BACKGROUND**

Count Four of the third amended complaint alleges a common law tort claim against SA Miller for malicious prosecution. ECF 82 ¶¶ 196-213. The United States has certified that SA Miller was acting in the scope of her employment for purposes of that claim and substituted itself for SA Miller under the Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, §§ 5, 6, 102 Stat. 4563 (1988) (codified at

28 U.S.C. § 2679) (the "Westfall Act"). ECF 88-1. The Westfall Act makes the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b) and §§ 2671-2680, "the exclusive remedy for most claims against Government employees arising out of their official conduct." *Hui v. Castaneda*, 559 U.S. 799, 806 (2010). Once the Attorney General or his or her designee certifies that the named employee was acting in the scope of employment, the common law tort claim against the employee is dismissed based on absolute immunity and becomes a claim exclusively against the United States under the FTCA. 28 U.S.C. § 2679(d)(1); *see also Osborn v. Haley*, 549 U.S. 225, 229, 247 (2007). Plaintiffs now challenge that scope-of-employment certification and request discovery and an evidentiary hearing on the issue.

**ARGUMENT**

A Westfall certification by the Attorney General's designee serves as *prima facie* evidence that the conduct at issue occurred in the scope of employment. *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1305 (11th Cir. 2022). When a plaintiff challenges the Government's certification, the burden is on the plaintiff to provide specific facts to rebut the certification. *Id.* To meet this burden, the plaintiff must furnish "specific evidence or the forecast of specific evidence that contradicts the Attorney General's certification decision, not mere conclusory allegations and speculation." *Omnipol, A.S. v. Worrell*, 421 F. Supp. 3d 1321, 1339 (M.D. Fla. 2019), *aff'd sub nom.*, 32 F.4th 1298.

Plaintiffs suggest that ordering Westfall discovery is the normal course: "*de novo* review cannot be performed on a one-page certification. Limited discovery and a short evidentiary hearing are the means by which that review is conducted." ECF 98 at 4. That has it backwards. "[T]here is no right to even limited discovery in a Westfall Act case unless and until a plaintiff alleges sufficient facts to rebut the Government's certification." *Wuterich v. Murtha*, 562 F.3d 375, 382 (D.C. Cir. 2009); *see also Omnipol*, 32 F.4th at 1305

(affirming denial of discovery where allegations fail to give rise to a plausible scope challenge); *Glover v. Donahoe*, 626 F. App'x 926, 930 (11th Cir. 2015) ("[N]othing mandates that a district court allow discovery and hold an evidentiary hearing before ruling on a Section 2679 certification."); *Glover v. Donahoe*, No. 13-2040, 2014 WL 1923798 (N.D. Ala. May 13, 2014) (denying Westfall challenge prior to any discovery). Nor are Plaintiffs entitled to Westfall discovery simply in search of evidence that might rebut the certification. *See Gutierrez de Martinez v. DEA*, 111 F.3d 1148, 1155 (4th Cir. 1997) (improper to order deposition of federal employee to explore possible inconsistences related to scope); *see also Wuterich*, 562 F.3d at 386 (denying Westfall discovery "for facts that *might* give rise to a viable scope-of-employment claim"); *Glover*, 2014 WL 1923798, at *3 ("[T]he inability to conduct discovery on the issue does not prevent [plaintiff] from making good-faith, factual arguments that the alleged conduct was not within the scope.").

"That bar for discovery is high, in part, because the Westfall Act confers absolute, not merely qualified, immunity upon federal employees acting within the scope of their official duties." *Plevnik v. Sullivan*, 146 F.4th 1174, 1184 (D.C. Cir. 2025) (internal quotations and citation omitted). Absolute immunity "entitles government officials not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery." *Id.* (citation omitted). Because forcing a federal employee to participate in Westfall discovery is a de facto denial of her rights under the Westfall Act and diminishes the protections Congress intended her to enjoy, an order of Westfall discovery is subject to immediate interlocutory appeal. *Wuterich*, 562 F.3d at 382.[1]

[1] Plaintiffs suggest, ECF 98 at 5, it would be unfair to substitute the United States for SA Miller because they failed to exhaust their administrative remedies under the FTCA prior to filing suit, which means the Court would lack subject matter jurisdiction over their claim. *See McNeil v. United States*, 508 U.S. 106, 113 (1993). Plaintiffs' failure to heed the FTCA's statutory commands provides no reason to disregard binding precedent.

**A. Plaintiffs fail to plead facts sufficient to rebut the Westfall Certification.**

To begin, the third amended complaint's allegations regarding SA Miller are not well-pled and in no way rebut the Government's certification that she was acting in the scope of employment. To the contrary, the third amended complaint itself pleads that the FBI tasked SA Miller with "gathering evidence" in the Proud Boys case, that at all times she was acting "under the color of federal law" as an employee of the United States, and that her acts are attributed to the United States for purposes of liability. ECF 82 ¶¶ 107, 197, 229. That ends the scope-of-employment debate and precludes Westfall discovery. Undeterred, Plaintiffs narrow their scope challenge to four discrete acts they allege were not in the scope of employment. They demand discovery on each one. None has merit.

**1. Intercepting attorney-client communications.**

Plaintiffs first allege that SA Miller intercepted attorney communications without a warrant, noting she "expressly states in chat logs that she has found pertinent and interesting communications between Rehl and his attorney that her colleagues should review." ECF 82 ¶ 86b. She did no such thing. According to the logs from the FBI's Lync messaging system that Plaintiffs cite in support, it was *another agent* (SA Wang) who monitored communications and then sent a message to SA Miller stating that he "found an email thread with Rehl and his attorney . . . [that] raised some interesting points." ECF 82-10 at 2. At best then, SA Miller received a message about an ongoing criminal case from a coworker on the FBI's Lync messaging system while on duty. That in no way pleads conduct that is outside the scope of employment.[2]

[2] It is unclear why Plaintiffs continue to insist SA Miller monitored Rehl's emails when they already admitted in the criminal case that she did not. *See United States v. Nordean*, No. 21-cr-175 (D.D.C. Mar. 13, 2023) (ECF 694 at 2) (recognizing it was another agent who messaged SA Miller about monitoring Rehl's emails).

Moreover, even if SA Miller herself monitored communications, that would not alter this analysis. Plaintiffs hinge their scope argument on the notion that the monitoring was unlawful because it was done without a warrant. ECF 98 at 7. Under D.C. law, however, "criminal conduct is not per se outside the scope of employment." *Rasul v. Myers*, 512 F.3d 644, 659 (D.C. Cir. 2008), *vacated and remanded on other grounds*, 555 U.S. 1083 (2008), *reinstated in relevant part*, 563 F.3d 527, 528-29 (D.C. Cir. 2009). More significantly, the monitoring was not unlawful. Plaintiffs raised this issue in the criminal case. Relying on a long line of cases, the district court held that by using the prison email system, Rehl waived his right to privacy over attorney communications. *United States v. Nordean*, No. 21-cr-175 (D.D.C. April 3, 2023) (ECF 731 at 6). That is because inmates must consent to law enforcement monitoring prior to using the prison email system and must acknowledge that any consent applies to attorney communications. *Id.* at 2-3. The district court specifically noted that Rehl acknowledged that his emails would be monitored for law enforcement purposes and that his emails to his attorney would not be treated as privileged. *Id.* at 3, 6. That acknowledgment negates any reasonable expectation of privacy necessary to plead a Fourth Amendment violation, obviating the need for a warrant. *See Kyllo v. United States*, 533 U.S. 27, 33 (2001).

That prison officials notify inmates that their emails are subject to law enforcement monitoring resoundingly refutes Plaintiffs' suggestion that monitoring is not the kind of conduct law enforcement is supposed to perform. On the contrary, it is well settled that gathering and reviewing evidence in support of a criminal case is a core function of law enforcement that plainly falls within the scope of employment. *See Hunter v. Leeds*, 941 F.3d 1265, 1278 n.16 (11th Cir. 2019); *Grider v. City of Auburn*, 618 F.3d 1240 (11th Cir.

2010). Moreover, the Government understood that law enforcement was monitoring prison emails during the Proud Boys case, set up a filter attorney to review them, and defended the conduct in a public filing. *United States v. Nordean*, No. 21-cr-175 (D.D.C. Mar. 20, 2023) (ECF 709). The numerous cases permitting such conduct, cited by the district court in the criminal case, confirm that monitoring prison emails is a routine investigative tactic and is not outside the scope of employment.

**2. Destruction of evidence.**

Plaintiffs next allege that SA Miller "was directed by her supervisor to destroy 338 items of evidence material to Plaintiffs' defense." ECF 82 ¶ 86b; *see also id.* ¶ 109. That her supervisor allegedly "directed" her to do it belies any suggestion that SA Miller acted outside the scope of employment. But that is beside the point. SA Miller did not do this either. Again, turning to the chat logs Plaintiffs cite in support, it was *another agent* (SA McLeod) who messaged, "my boss assigned me 338 items of evidence I have to destroy." ECF 82-10 at 5. And the evidence had nothing to do with the Proud Boys. It was a separate twenty-year-old case that had since closed. Plaintiffs have no basis to assert otherwise. Indeed, Plaintiffs raised this issue as well in the criminal case, prompting the district court to make the following oral ruling:

> On this point, another agent messaged Agent Miller that her supervisor had assigned her to, quote, "destroy" "338 items of evidence." There's nothing in the record to suggest that the agent who sent this message was involved in this case or that this destruction related to evidence in this case.
>
> The Government, again, here, proffered an explanation for this statement. The comment related to evidence in FBI custody from a nearly 20-year-old multi-defendant trial. According to the Government, disposing of evidence in this way is standard and consistent with DOJ policy once the case is completed and all the defendants' appeals have been exhausted. . . . So under Rule 403, I'm not going to allow any inquiry into this subject where

> there's no good-faith basis to believe that the message has anything to do with this case and Agent Miller was not the author.

*United States v. Nordean*, 21-cr-175 (D.D.C. Mar. 13, 2023), at p. 12918:11-12919:18 (attached hereto as Ex. 1). Plaintiffs provide no justification as to why further inquiry into this subject is warranted. *See Hargrove v. PV Holding Grp.*, No. 26-3738, 2026 WL 2210032, at *2 (N.D. Fla. July 8, 2026) (speculation that discovery "could provide" something different does not justify ordering Westfall discovery).

**3. Coercing witness Jeremy Bertino.**

Plaintiffs allege SA Miller coerced witness Jeremy Bertino to falsely attribute to Tarrio an incriminating document entitled, "1776 Returns," that was emailed to Tarrio, even though, according to Plaintiffs, the Government had no evidence Tarrio opened or read the email. ECF 82 ¶¶ 76-79. In support, they attach an affidavit from Bertino that makes no mention of SA Miller. ECF 82-4. Moreover, Westfall discovery is only available when the evidence sought is material to the underlying tort claim. *Gutierrez de Martinez*, 111 F.3d at 1155. Here, whether SA Miller coerced Bertino is immaterial because Plaintiffs never allege he testified before the grand jury.[3] The alleged coercion therefore is irrelevant to the presumption of probable cause created by the grand jury indictment, which defeats the malicious prosecution claim. *See* ECF 87 at 28.

Also, the thrust of Plaintiffs' argument is that Plaintiffs knew Bertino was lying at trial about the incriminating "1776 Returns" document because the Government could not "forensically" prove Tarrio opened or read the email that contained the document. ECF 82 ¶ 78; ECF 82-3. But Plaintiffs presented that very argument at trial. ECF 82 ¶ 78. A jury still

---

[3] Plaintiffs have the grand jury transcript. Minute Order, *United States v. Nordean*, No. 21-cr-175 (D.D.C. June 9, 2022) ("[T]he Government has already given Defendants a 160-page grand jury transcript, with exhibits.").

convicted them. Thus, this alleged fact, which failed to persuade a jury, does not materially undermine probable cause, which requires a significantly lower standard of proof. *Zivojinovich v. Barner*, 525 F.3d 1059, 1072 (11th Cir. 2008). In sum, even if SA Miller coerced Bertino, and even if that conduct was outside the scope of her employment (which it is not), it nonetheless is irrelevant to the underlying tort claim. Further inquiry into this subject via discovery and an evidentiary hearing would be pointless.

**4. Threatening witness Shane Lamond.**

In their original complaint, Plaintiffs alleged that two unidentified agents approached Shane Lamond shortly before he was set to testify as a defense witness and threatened him with obstruction-of-justice charges if he testified on behalf of Plaintiffs. ECF 1 ¶ 90. Based on that supposed last-minute threat, Lamond refused to testify. *Id.* ¶ 92. After SA Miller pointed out in her first motion to dismiss that this could not state a claim against *her*, Plaintiffs amended their complaint to baldly allege that these two unidentified agents acted at her "behest" and at the "behest" of Deputy Chief Jocelyn Ballantine of the United States Attorney's Office for the District of Columbia—though later in the third amended complaint Plaintiffs confusingly allege this was done solely at the behest of Deputy Chief Ballantine. *Compare* ECF 82 ¶ 12 *with* ¶ 98. In any event, Plaintiffs provide no factual support for their conclusory allegation that these two unidentified agents acted at the behest of anyone. *See Scharnhorst v. Cantrell*, No. 22-5218, 2023 U.S. Dist. LEXIS 48198, at *44, 45 (W.D. Ark. Mar. 1, 2023) (bald allegation officer was acting "at the behest" of another does not state claim absent facts to suggest how plaintiff knows); *Okey v. Ivicic*, No. 18-18, 2018 U.S. Dist. LEXIS 82893, at *4-5 (W.D. Pa. May 15, 2018) (same).

In any event, this supposed last-minute threat never happened. As Plaintiffs conceded in the criminal case, the Government told Lamond's lawyer months before trial began that Lamond was under investigation for obstruction charges. *United States v. Nordean*, No. 21-cr-175 (D.D.C. Dec. 6, 2022) (ECF 572 at 8). Lamond indicated he would not testify. *Id.* Plaintiffs then moved the court—again, before trial began—to compel the Government to immunize Lamond so he could testify. *Id.* The district court denied the motion, finding the Government acted within its discretionary authority in its dealings with Lamond. *See United States v. Nordean*, No. 21-cr-175 (D.D.C. Jan. 5, 2023) (ECF 625 at 5-6, 8-9). The district court also found no evidence the Government threatened Lamond: "With no evidence of threats, harassment, intimidation, or other misconduct, the Court will not second-guess the Government's investigative or prosecutorial decisions, matters which are firmly committed to the executive branch's discretion." *Id.* at 5-6. Plaintiffs made no further attempts to call Lamond as a witness. In other words, no last-minute threat against Lamond occurred before he was allegedly supposed to testify—after the district court refused to immunize him, he was never scheduled to testify.

Finally, Lamond was eventually convicted for obstruction of justice. *See United States v. Lamond*, No. 23-cr-177 (D.D.C. Dec. 23, 2024). So the investigation against him had a substantial basis. Communicating to a witness the existence of a potential criminal charge that has a firm basis in law and fact does not constitute a threat or intimidation. *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1124 (10th Cir. 2007). Nor does such conduct fall outside the scope of employment for a law enforcement officer.

### B. Even if the third amended complaint's allegations of malfeasance are true and fairly attributed to SA Miller, they still do not rebut the Westfall certification as a matter of law.

The absence of facts to support the third amended complaint's allegations of misconduct alone warrants denying the request for discovery and an evidentiary hearing. *Glover*, 626 F. App'x at 930 ("Discovery and an evidentiary hearing are particularly unnecessary in this case, where [the plaintiff] alleged no facts to support his contention that Defendants were acting outside the scope of their employment."). And Plaintiffs are not entitled to discovery simply because they speculate that evidence might be out there that paints a different picture than the mountain of evidence produced in the criminal case. *Hargrove*, 2026 WL 2210032, at *2. But even taking their conclusory allegations as true and fairly attributed to SA Miller, their request for discovery and an evidentiary hearing should still be denied.

Whether an employee acted in the scope of employment for purposes of the Westfall Act is governed by the law of the state where the incident occurred. *Omnipol*, 32 F.4th at 1305. The parties agree that D.C. law governs. Under D.C. law, conduct is within the scope of employment if it (1) is of the kind the employee is employed to perform; (2) occurs substantially within the authorized time and space limits; and (3) is actuated, at least in part, by a purpose to serve the master. *Jacobs v. Vrobel*, 724 F.3d 217, 221 (D.C. Cir. 2013). Plaintiffs cite these factors, but never analyze them. For example, they never dispute that SA Miller's conduct occurred substantially within the authorized time and space limits (factor two). Plaintiffs appear to dispute factors one and three, cursorily stating that SA Miller's alleged conduct was "not the 'kind' of acts the FBI employs a special agent to perform" and that she "express[ed] personal hostility" against the Proud Boys. ECF 98 at 8. But Plaintiffs'

focus on (unsupported) allegations of misconduct—as opposed to the underlying dispute—completely misunderstands the scope-of-employment inquiry under D.C. law.

"District [of Columbia] law requires that [courts] focus on the *type* of act . . . not the wrongful character of that act." *Jacobs*, 724 F.3d at 222. (emphasis added). Thus, the proper inquiry "focuses on the underlying dispute or controversy, not on the nature of the tort, and is broad enough to embrace *any intentional tort* . . . that was originally undertaken on the employer's behalf." *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 664 (D.C. Cir. 2006) (emphasis added). "[W]ere the inquiry limited to the tortious conduct itself without the underlying context, the characteristics of that conduct might misleadingly appear to be personal in nature." *Trump v. Carroll*, 292 A.3d 220, 235 (D.C. 2023). Instead, "[e]xtensive precedent makes clear that alleging a federal employee violated policy or even laws in the course of her employment—including specific allegations . . . of potentially criminal activities—does not take that conduct outside the scope of employment." *Smith v. Clinton*, 886 F.3d 122, 126 (D.C. Cir. 2018); *see also Rasul*, 512 F.3d at 659 (allegations of serious criminal conduct, including torture, do not alter scope-of-employment analysis where alleged conduct was incidental to authorized conduct), *vacated and remanded on other grounds*, 555 U.S. 1083 (2008), *reinstated in relevant part*, 563 F.3d at 528-29. Conduct is properly deemed to be in scope even if the employee's predominate purpose was personal so long as there is at least "some discernable purpose" to serve the employer. *Plevnik*, 146 F.4th at 1183. Even unauthorized conduct can be in scope so long as the alleged conduct was a "direct outgrowth of," or "incidental to," official duties. *Allaithi v. Rumsfeld*, 753 F.3d 1327, 1332-33 (D.C. Cir. 2014).

The test is applied "*very expansively*, and in essence ask[s] whether the defendant merely was on duty or on the job when committing the alleged tort." *Id.* at 1330 (citation omitted) (emphasis added). As the D.C. Circuit has explained, "[m]any states and D.C. apply the scope-of-employment test very expansively, in part because doing so usually allows an injured tort plaintiff a chance to recover from a deep-pocket employer rather than a judgment-proof employee." *Harbury v. Hayden*, 522 F.3d 413, 422 n.4 (D.C. Cir. 2008). For Westfall purposes*,* that means "tort claims against federal government employees often proceed against the Government itself under the FTCA rather than against the individual employees under state law." *Id.*

For example, courts have found conduct to be in the scope of employment under D.C. law where an employee, motivated by personal animus, made defamatory statements to the press because although the employee was not tasked with making defamatory statements, he *was* tasked with responding to press inquiries. *See, e.g.*, *Ballenger*, 444 F.3d at 664-65; *Wuterich*, 562 F.3d at 384. Courts have also found allegations of systemic abuses, including torture, to be in the scope of employment under D.C. law because although the employee was not tasked with abusing enemy combatants, he *was* tasked with interrogating them. *See, e.g.*, *Rasul*, 512 F.3d at 656-59; *Allaithi*, 753 F.3d at 1333. Finally, courts have found conduct to be in the scope of employment under D.C. law where a laundromat employee shot a customer over a missing shirt and a delivery man assaulted and raped a customer during a delivery-related dispute. *See, e.g.*, *Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1981); *Lyon v. Carey*, 533 F.2d 649, 652 (D.C. Cir. 1976). In each case, the alleged misconduct was a direct outgrowth of specific authorized conduct and incidental to official duties.

On this point, the Eleventh Circuit's decision in *Grider* is particularly instructive. There, the court recognized one might reasonably believe that pursuing false charges and maliciously prosecuting someone, as alleged here, "is never a job-related function or within the scope of a police officer's employment." *Grider*, 618 F.3d at 1261. The court continued:

> However, the question of whether a defendant acted within the scope of his employment is distinct from whether the defendant acted unconstitutionally. The scope-of-employment inquiry is whether the employee police officer was performing a function that, but for the alleged constitutional infirmity, was within the ambit of the officer's scope of authority (*i.e.*, job-related duties) and in furtherance of the employer's business.
>
> [Here,] we thus ask whether it was within [the officer's] job duties or scope of authority to make bribery charges against [the plaintiff], not whether he was authorized or employed to file false bribery charges in furtherance of the City's business. All of [the officer's] acts were clearly within the scope of his employment as a law enforcement officer. . . . Our inquiry is not whether [the officer] had the authority to prosecute in an unconstitutional manner and with malicious intent, but instead whether engaging in prosecutions is part of [the officer's] job-related powers and responsibilities. And, of course, law enforcement officers are empowered precisely to prosecute violations of law.

*Id.* at 1261-62. That analysis applies here with equal force.[4]

The D.C. Circuit opinion in *Rasul* is also instructive. There, the plaintiffs alleged they were tortured while detained at Guantanamo Bay. *Rasul*, 512 F.3d at 650-51. They filed claims under the Alien Tort Statute for torture and other mistreatment. *Id.* at 654. The United States certified that the named employees acted in the scope of employment and substituted itself as the sole defendant. *Id.* at 655. In response, the plaintiffs argued that torture could never fall within the scope of employment because the defendants were not authorized to engage in torture, the conduct was seriously criminal, and the United States

[4] While *Grider* was applying federal law in analyzing the scope issue as opposed to D.C. law, its analysis is persuasive because both tests focus on the function being performed, not the alleged misconduct.

has long condemned torture. *Id.* at 656. Applying D.C. law, the D.C. Circuit rejected those arguments, holding that the relevant inquiry is on the "type of act" being performed—the detention and interrogation of suspected enemy combatants—which is what the defendants were employed to engage in. *Id.* at 658. The D.C. Circuit further held that the allegations of torture were "incidental to the defendants' legitimate employment duties" and thus in the scope of employment. *Id.* at 659; *see also id.* at 660 ("[T]he allegations of serious criminality do not alter our conclusion that the defendants' conduct was incidental to authorized conduct.").

Here, the underlying dispute involves the investigation and prosecution of suspected criminals—a core function of law enforcement. Although Plaintiffs argue that SA Miller's alleged misconduct (unlawfully gathering evidence, destroying evidence, and coercing and harassing witnesses) is not the kind the FBI expects an agent to perform, ECF 98 at 8, under *Rasul* and *Grider*, that is not the inquiry. It is irrelevant whether the FBI condones the alleged misconduct. Rather, the proper focus is on the "type of act" performed—here, the gathering and handling of evidence and witnesses in a criminal case—*not* the wrongful character of the acts. Just as in *Rasul*, where allegations of torture were deemed a "direct outgrowth of" legitimate employment duties to interrogate suspected enemy combatants, the allegation of coercion here, as one example, is a "direct outgrowth of" legitimate employment duties to interrogate a cooperating witness. Even if the alleged misconduct involved policy violations or serious criminal acts, that does not take the conduct outside the scope of employment under D.C. law. *Rasul*, 512 F.3d at 660. Again, D.C. law is purposely "broad enough to embrace *any intentional tort* . . . that was originally undertaken on the employer's behalf." *Ballenger*, 444 F.3d at 664 (emphasis added). The same is true for the

allegations that SA Miller expressed hostility towards the Proud Boys. ECF 98 at 8. That is because in prosecuting suspected criminals, "some discernable purpose" to serve the employer is present, even if the predominant purpose was allegedly personal and the intent allegedly malicious. *See Plevnik*, 146 F.4th at 1183-84.

Because the alleged conduct falls within the scope of employment—regardless of whether that conduct in fact occurred and could fairly be attributed to SA Miller—no fact-issues remain to be resolved. Thus, there is no basis to allow any discovery or to hold an evidentiary hearing. *Rasul*, 512 F.3d at 662. Plaintiffs have simply failed to meet their burden of alleging facts sufficient to rebut the Government's certification. Adhering to these principles is especially important in the malicious-prosecution context, where virtually every malicious prosecution claim relies on allegations that the prosecution was based on false or fabricated evidence or that witnesses were coerced. In other words, if such allegations alone were sufficient to rebut a Westfall certification, substitution would never be appropriate, and absolute immunity would be denied in virtually every case alleging a federal employee prosecuted a case maliciously. That is not the law. *See, e.g.*, *Dolan v. United States*, 514 F.3d 587, 594 (6th Cir. 2008) ("Here, the individual federal defendants were employed by the federal government to investigate and prosecute cases . . . even if they acted improperly or maliciously in investigating or prosecuting Plaintiff . . . they were still within the scope of their employment."); *Trump v. Clinton*, 626 F. Supp. 3d 1264, 1283-84 (S.D. Fla. 2022) (denying Westfall challenge under D.C. law in malicious prosecution case alleging FBI agents commenced large-scale investigation, recognizing it is well within scope of employment for FBI agents to investigate cases, even if they did so maliciously as

part of political witch hunt). This Court should therefore deny Plaintiffs' request for discovery and an evidentiary hearing.

## CONCLUSION

Defendants are unaware of any case finding that law enforcement acted outside the scope of employment in investigating and prosecuting a case. Plaintiffs provide no basis for this Court to be the first. Plaintiffs' motion should be denied.

## CERTIFICATION UNDER PENALTY OF PERJURY THAT ARTIFICIAL INTELLIGENCE WAS NOT USED IN THE PREPARATION OF THIS FILING

I have reviewed the Standing Order Requiring Disclosure of the use of artificial intelligence. After diligent inquiry and under penalty of perjury, I certify that artificial intelligence was not utilized in the preparation of this filing in any way. I understand that, whether I represent myself or I am an attorney representing a client, I have an affirmative obligation to read each case cited in this filing. If I fail to do so and a case upon which I rely does not exist or does not reasonably stand for the cited proposition, I understand that the Court may treat this as a violation of Rule 11 of the Federal Rules of Civil Procedure. I have reviewed Rule 11 of the Federal Rules of Civil Procedure and I understand that this rule applies equally to counsel and unrepresented parties, and I am familiar with the sanctions available for violations of Rule 11. If this certification is made by counsel, I further understand that citation to a case that either does not exist or does not reasonably stand for the cited proposition may be treated as a violation of my oath of candor toward the tribunal and a basis on which my admission to practice in the Middle District of Florida could be revoked or suspended. Further, whether I represent myself or I am an attorney representing a client, I understand that by making this certification under penalty of perjury I could be referred for criminal prosecution if the statements I make here are false.

This 24th day of September, 2026.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General
Torts Branch

PAUL E. WERNER
Assistant Director

/s/ Siegmund F. Fuchs
SIEGMUND F. FUCHS
Senior Trial Counsel
Civil Division, Torts Branch
U.S. Department of Justice
Ben Franklin Station
P.O. Box 7146
Washington, D.C. 20044-7146
202-598-3916
siegmund.f.fuchs@usdoj.gov

Attorneys for the United States and SA Miller

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 24, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to the following CM/ECF participants:

Thomas F. Ranieri, Esq.

/s/ Siegmund F. Fuchs
SIEGMUND F. FUCHS
Senior Trial Counsel
Civil Division, Torts Branch
U.S. Department of Justice